METPATH, INC., Appellant-Respondent, v BIRMINGHAM FIRE INSURANCE COMPANY OF PENNSYLVANIA, Respondent-Appellant.

First Department, May 13, 1982

APPEARANCES OF COUNSEL

*Charles H. Miller* of counsel (*Maura J. Wogan* and *Robert J. Kipnees* with him on the brief; *Marshall Bratter, Greene, Allison & Tucker,* attorneys), for appellant-respondent.

*Michael A. Ellenberg* of counsel (*LeBoeuf, Lamb, Leiby & MacRae,* attorneys), for respondent-appellant.

**OPINION OF THE COURT**

ASCH, J.

Plaintiff Metpath, Inc. (Metpath), supplies clinical laboratory services nationwide but does its primary laboratory work in New Jersey. It utilizes air transportation for shipment of specimens to its laboratory. Many of its services must be performed within 24 hours after obtaining a specimen to prevent spoilage and to obtain quick responses.

When an air traffic controllers' strike was threatening to take place in June of 1981, Metpath sought to protect itself by obtaining a policy of insurance to protect against the increased costs which would be incurred if private air service or other means of transport would have to be used during the strike.

On June 18, 1981, Melvin M. Overman, a vice-president of Metpath, contacted an insurance broker, Johnson & Higgins (J&H), to place that insurance for Metpath. J&H procured the Birmingham Fire Insurance Company of Pennsylvania (Birmingham) to undertake such insurance. Birmingham's underwriting manager, Charles E. Flood, agreed to accept the risk and signed a two-page binder on June 19, 1981, providing that policy "wording [would] follow".

The strike anticipated for June 22 did not take place and an agreement was made on June 24 to issue a one-year contract to accommodate Metpath. The device of a flat one-year contract was used because the premium was $340,000, of which $170,000 was deemed earned even if no strike took place. Metpath could not justify a $170,000 expenditure to its auditors absent at least a hypothetical one-year term.

The proposed policy was subject to drafts and revisions and was finally issued with a date of August 2, 1981. The strike took place on August 3, 1981. Metpath filed a claim with Birmingham but Birmingham declined to make payment. The basis for refusal was that the policy provided for a seven-day waiting period before claims could arise, and that the strike ended before the seven-day period had elapsed, when the employment of controllers was terminated by declaration of the President of the United States on August 5, 1981.

Special Term denied summary judgment to both sides noting that there were such issues of fact as the termination date of the strike, the effect of the strike on Metpath's usual business practices and other issues related to ascertaining the dollar losses incurred.

On this appeal Metpath argues that the losses were covered under the policy and that it is entitled to summary

judgment. Birmingham argues that under the contract it is entitled to judgment dismissing the complaint since the ending of the strike terminated any coverage, and that any ambiguity should be resolved against Metpath, the alleged drafter of the policy.

The coverage terms of the policy specifically provided that:

"4. COVERAGE

"This policy covers the necessary Extra Expense, as hereinafter defined, incurred by the Assured in order to continue as nearly as practicable the normal operation of the Assured's business following disruption of the Assured's business caused by or resulting from strike or slowdown of Air Traffic Controllers because of failure to reach agreement and ratification of a collective bargaining agreement which is approved by Congress.

"Coverage exists only for the strike or slowdown originally scheduled to begin June 22, 1981 and subsequent postponements of that strike. If that originally scheduled strike is delayed or postponed for any reason including, but not limited to, agreement by the parties involved in the strike talks, a court order, or a cooling-off period, this policy provides Extra Expense coverage for that strike or slowdown when, and if, it occurs.

"Coverage will cease 12 hours after a new contract has been ratified by the Air Traffic Controllers and approved by Congress.

"The strike or slowdown must commence during the policy period but is not limited by the date of expiration of the policy.

"Extra Expense shall mean the excess (if any) of the total cost incurred during the period of a strike or slowdown chargeable to the operation of the Assured's business, over and above the total cost that would normally have been incurred to conduct the business during the same period had no strike or slowdown occurred.

"5. DEDUCTIBLE

"There shall be no liability under this policy until seven days from the commencement of a strike or slowdown of

Air Traffic Controllers. The period of 7 days shall be cumulative and not necessarily consecutive. In no event shall more than a total 7 day waiting period be imposed."

The language in the second full paragraph above quoted is clear and unequivocal. It states that "coverage exists only for the strike or slowdown originally scheduled to begin June 22, 1981, and subsequent postponements of that strike."

The last paragraph entitled "Deductible" expressly states that "There shall be no liability under this policy until seven days from the commencement of a strike or slowdown of Air Traffic Controllers."

There is no dispute that the air traffic controllers engaged in a strike commencing on August 3, 1981. The crucial issues presented on this appeal are: Has the strike by the air traffic controllers ended, and if so, was this before the expiration of the seven-day deductible period provided for in the policy?

The court in *United States v Professional Air Traffic Controllers Organization* (524 F Supp 160, 164) concluded: "When an employer has terminated employees and has stated that it will not permit them to return to work, there is, by definition, no longer a strike, for under such circumstances the employees cannot return to work, even if they are of a mind to do so." Thus, it was held by a Federal District Judge that President Reagan caused the striking air traffic controllers to be terminated effective 8:00 A.M. on August 6, 1981 and that the strike ended on that date. (See, also, *United States v Professional Air Traffic Controllers Organization,* 525 F Supp 820.)

Statutory definitions and governmental acts frequently control the application of insurance policies. (*Insurance Co. of North Amer. v Rosenberg,* 25 F2d 635; *Brous v Imperial Assur. Co.,* 130 Misc 450, 452, affd 223 App Div 713.)

New York courts have relied on governmental acts and pronouncements to resolve disputes over insurance coverage (*Neidle v Prudential Ins. Co. of Amer.,* 299 NY 54; *Wilkinson v Equitable Life Assur. Soc. of U. S.,* 2 Misc 2d 249), even those of foreign governments (*Vanderbilt v Travelers Ins. Co.,* 112 Misc 248, affd 202 App Div 738, affd

235 NY 514; *Shneiderman v Metropolitan Cas. Co. of N. Y.*, 14 AD2d 284; see, also, *Stawski v John Hancock Mut. Life Ins. Co.*, 7 Misc 2d 424, app dsmd 4 AD2d 940).

The strike by the air traffic controllers ended on August 6, 1981, a date well within the seven-day deductible provision in the insurance policy.

The dissent rewards the diligence of Metpath for its prescience of the strike and its attempt to minimize its anticipated extraordinary expenses. Unfortunately Metpath's legitimate expectations were restricted by the express limitations of the policy which it had such an important role in drafting. These risks to which Birmingham, as a correlative, agreed and upon which it calculated its premiums were also restricted by the express limitations of the policy. The termination of the strike by ukase of President Reagan, frustrated the possibility of compliance with the liability requirements of the policy. To change and broaden the coverage of the insurance contract between the parties, in derogation of its express provisions, would impose an unjustifiable hardship on the insurance company, and confer an unjustifiable windfall to the assured.

The doctrines of "impossibility" or "frustration of purpose", excusing performance of contract, is at the present time established law in most civil-law and common-law jurisdictions outside of the United States (Smit, Frustration of Contract: A Comparative Attempt at Consolidation, 58 Col L Rev 287), and in the last 50 years has gained wider acceptance here. (See, e.g., 18 Williston, Contracts [3d ed], § 1931.)

There is ample authority holding that where performance becomes impossible because of action taken by government, performance is excused. (See 10 NY Jur, Contracts, § 373, and cases there cited.)

This was recognized by the court when it held it to be error to grant the City of New York summary judgment against a defendant tugboat operator for failing to supply towing services during a port-wide strike which commenced after a contract had been made between the parties for such services. (*City of New York v Local 333, Mar. Div.,*

*Int. Longshoremen's Assn.,* 79 AD2d 410, affd 55 NY2d 898.)

Justice SILVERMAN there explained that since the contract contained no express provision either excusing or not excusing defendant from performance in the event of a strike, without a more complete record, it could not be said, as a matter of law, that defendant was not excused from performance or liability on the grounds of "impossibility" of performance.

In the case presently before the court, there is no uncertainty with respect to the facts concerning the negotiations of the parties and as to what they anticipated. They did not anticipate, nor could they reasonably contemplate that the President would unilaterally end the strike by fiat in three days.

Contracts of insurance are to be construed in the same way as any other contract. As the court so aptly said in *Johnson v Travelers Ins. Co.* (269 NY 401, 407): "Unless we are prepared to adopt the theory of the cynic that language was invented for the purpose of concealing thought, we have no right to disregard the clear provisions which defendant [insurer] inserted in the policy and which plaintiff [insured] accepted."

It is not the function of a court to reconstruct a contract of insurance negotiated by the parties themselves to accomplish the court's notions of what is proper. (See *Breed v Insurance Co. of North Amer.,* 46 NY2d 351, 355; *Government Employees Ins. Co. v Kligler,* 42 NY2d 863; *Novak v All City Ins. Co.,* 43 NY2d 854.)

"While parties to an insurance contract cannot foresee the myriad of possible future happenings, they can agree to terms which encompass their intent" (*Zimring v English & Amer. Ins. Co.,* NYLJ, Oct. 5, 1981, p 14, cols 4, 5). The intent of the parties is obvious from the insurance policy.

The policy language at issue here, considering that it was negotiated by the parties, through their representatives, demonstrates that the coverage was only to be effective during the period of a strike. Nonetheless, even if the policy language is considered ambiguous or open to doubt, any ambiguity or doubt must be resolved against Metpath

and in favor of Birmingham since the drafter of the insurance policy was Metpath's agent, J&H, and those provisions requested by Metpath's representatives are the very provisions which limit the coverage to the period of the strike. (*Hodom v Stearns,* 32 AD2d 234, 236, app dsmd 25 NY2d 722; *731 West Lake Rd. v Boheen,* 58 AD2d 1038, 1038-1039; see, also, *De Cillis v E. G. & B., Inc.,* 55 AD2d 1031.)

In this case, Metpath purchased necessary extra expense insurance for losses it might incur "during the period of a strike or slowdown" by the air traffic controllers. Metpath *did not request or purchase labor interruption, business interruption, transportation interruption or some other type of insurance.* The extra expense insurance purchased by Metpath or any of these other types of insurance which could have been purchased by Metpath could have included provisions to protect Metpath from disruption of its business prior to, during and after the strike ended. The policy purchased by Metpath *only covered losses "during the period of a strike or slowdown".*

During the course of the negotiations, none of the participants could reasonably anticipate that the Federal Government would discharge the striking air traffic controllers. Neither the possibility nor effect of this eventuality was ever discussed by any of the parties or their representatives during the extensive negotiations.

Under the circumstances here presented, the insurance policy came to an end, rescinded by the occurrence of the unexpected action of President Reagan in terminating the strike. Birmingham, whose further liability is excused by reason of supervening impossibility, is nevertheless liable to Metpath for what the latter has paid in premium under the terms of their agreement. (See 10 NY Jur, Contracts, § 378, and cases there cited.)

Accordingly, the order of the Supreme Court, New York County (BLANGIARDO, J.), entered December 14, 1981, denying defendant's motion and plaintiff's cross motion for summary judgment should be modified, on the law, to the extent of granting plaintiff's cross motion for summary judgment for all sums paid as premiums to defendant

pursuant to the policy of insurance and otherwise affirmed, without costs.

SILVERMAN, J. (dissenting). I would modify the order appealed from to the extent that I would grant plaintiff's motion for partial summary judgment on the issue of liability only, and remand the matter for assessment of damages.

Plaintiff bought an insurance policy to insure against extra expense "caused by or resulting from strike" of air traffic controllers. The strike took place and plaintiff suffered the damage. The policy provided that there should be no liability until seven days from the commencement of the strike. Three days after commencement of the strike, in accordance with the orders of the President and Secretary of Transportation, all striking air traffic controllers were discharged; and it is therefore argued that the strike did not last seven days and that therefore there is no liability on the policy. I think this argument is fallacious.

It may be that for purposes of injunction against, or punishment of, the union or the employees, the strike terminated at the point at which the employer said it would not permit the employees to come back. But we are here concerned with the proper interpretation of a contract and the guiding rule of course is the intention of the parties and the reasonable expectations of the parties. The damage suffered by plaintiff, whether before or after the discharge of the employees because of the strike, was "caused by or resulting from strike" of the air traffic controllers. Within the meaning of the policy, there was an ongoing labor dispute and strike, even after the discharge of the employees. We take judicial notice of the fact that the employees continued to picket and, at least for some period, were unwilling to return to work. The whole country knew there was an air traffic controllers' strike and that it was not just a three-day matter.

The policy provided that coverage would cease 12 hours after a new contract had been ratified by the air traffic controllers and approved by Congress. It may be that this will never happen. Whatever problems that may pose as to the maximum duration of the strike, it poses none as to the

minimum duration of the strike — at least seven days. Incidentally it does not even necessarily follow that the strike must be deemed to continue indefinitely. Perhaps the strike and its effects ended within the contemplation of the parties when the airlines had adjusted to normal operations, i.e., normal and predictable in the existing situation. But that, it seems to me, goes to the issue of damages. The risk the parties were insuring against was extra expense caused or resulting from strike of the air traffic controllers. That risk materialized and unquestionably continued for more than a week. I think plaintiff is entitled to the protection it bargained for.

SULLIVAN, J. P., and FEIN, J., concur with ASCH, J.; SILVERMAN and LYNCH, JJ., dissent in an opinion by SILVERMAN, J.

Order, Supreme Court, New York County, entered on December 14, 1981, modified, on the law, to the extent of granting plaintiff's cross motion for summary judgment for all sums paid as premiums to defendant pursuant to the policy of insurance and otherwise affirmed, without costs and without disbursements.