*744 OPINION OF THE COURT
Eric N. Vitaliano, J.
Dreams of a honeymoon safari in East Africa dashed offer fresh evidence of how the terror attack on the World Trade Center of September 11, 2001 has shredded the lives of ordinary New Yorkers and has engendered still continuing reverberations in decisional law. What might have ordinarily warranted summary disposition in favor of the safari company and its travel agent, pinning on the traveler the economic burden of trip cancellation, cannot, in the wake of September 11th, be sustained here on their motion for summary judgment.
Defendant Taicoa Corporation, doing business as Micato Safaris (Micato), acknowledges that plaintiff Alexandra Bush contacted Micato about booking a safari. By its admission, Micato referred the plaintiff to defendant ProTravel International, Inc. (ProTravel), a retail travel agent, to arrange for a reservation on one of the various safaris offered by Micato. It is undisputed that, on or about May 8, 2001, the plaintiff booked an African safari travel package for herself and her fiancé through ProTravel with Micato. At that time, it is also undisputed, the plaintiff gave ProTravel an initial 20% deposit in the amount of $1,516. Micato admits that it received the plaintiffs deposit from ProTravel on May 15, 2001. The safari Alexandra Bush selected for husband to be and herself was scheduled to begin on November 14, 2001.
Sixty-four days before the safari’s start, September 11, 2001, the world, as we knew it, came to an end. As a result of the attack on the World Trade Center, other terrorism alerts and airline scares, the plaintiff and her fiancé decided almost immediately to cancel their trip. Further, the plaintiff claims, she endeavored to notify ProTravel of her decision, but, as a result of the interruption of telephone service between Staten Island, where she had fled to safety, and Manhattan, where ProTravel maintained an office in midtown, she was physically unable to cdidfiiunicate her cancellation order until September 27, 2001. ProTravel agrees that the plaintiff did contact it that day and avers it passed along her request to Micato orally and in writing. Micato acknowledged receiving a fax from ProTravel to that effect on October 4, 2001. Thereafter, when the defendants refused to return her deposit, Alexandra Bush sued in this action to get it back.
The defendants, by their Manhattan and Massachusetts counsel, now move for summary judgment dismissing this action. The court notes that it has granted a separate motion permitting counsel from the Massachusetts firm of Rubin, Hay *745 & Gould, P.C. to appear pro hac vice to argue this motion for summary judgment. In support of the motion, counsel have appeared for oral argument and submitted four affidavits and two memoranda of law. The court notes that the second affidavit of Patricia Buffolano, dated June 7, 2002, and received by the court on June 10, 2002, is clearly a late submission. Counsel appeared on the June 6, 2002 submission date and did not request an adjournment in order to submit further papers. Nevertheless, the court has considered this affidavit in deciding the motion.
The defendants’ motion hangs on a registration form. A copy of a completed form executed by Alexandra Bush was annexed to the moving affidavits of Joseph Traversa and Patricia Buffolano. Mr. Traversa, the employee of ProTravel who made the plaintiffs travel arrangements, states that the plaintiff completed and signed the form when she booked the safari on May 8, 2001. The form contained the following provision: “I confirm that I have read and agree to the Terms and Conditions as outlined in our brochure.” Also annexed to the moving affidavits was an excerpt the defendants contend was in the “brochure” referenced in the registration form, and which the plaintiff claims she never received, setting forth Micato’s cancellation policy for the safari booked by Ms. Bush. The policy imposes a $50 per person penalty for a cancellation occurring more than 60 days prior to departure. For a cancellation occurring between 30 and 60 days prior to departure, the traveler was subject to a penalty equal to 20% of the total retail tour rate. There is no disagreement that the deposit given by the plaintiff was in an amount equal to 20% of the tour rate.
With a departure date of November 14, 2001, for Alexandra Bush the days of moment under the cancellation policy were September 14, 2001 and October 15, 2001. A cancellation order given by her on or before September 14, 2001, the 61st day prior to departure, would have subjected her to, at worst}i3r$50 per person, i.e., a $100 penalty. Any cancellation after that date but on or before October 15, 2001 would subject her to the greater 20% penalty under the cancellation policy. Using either the September 27, 2001 date Mr. Traversa admits ProTravel received Ms. Bush’s notice of cancellation or the October 4, 2001 date Micato’s general manager, Patricia Buffolano, claims in her affidavit that Micato received written confirmation of the cancellation from ProTravel, the plaintiffs trip cancellation came within the 30- to 60-day prior to departure window that would trigger a 20% penalty for cancellation. On the strength *746 of those facts, neither defendant returned the deposit to Alexandra Bush and both now seek summary judgment dismissing her claim.
Without conceding that the cancellation policy the defendants advance as their sword and buckler is either valid or binding on her, Ms. Bush states in her affidavit submitted in opposition to the motion that, beginning on September 12, 2001 and continuing for days thereafter, she attempted to contact the travel agency and that due to difficulties with telephone lines, access to Manhattan and closures of its office, she was unable to speak to someone from ProTravel -until September 27, 2001. All of the phone calls made by the plaintiff to ProTravel were placed from Staten Island. While ProTravel’s reply affidavit protests that it was open for business from September 12th and onward and supplies phone records to show its phones were able to make and receive calls, no evidence is offered to dispute the plaintiffs claim that it was virtually impossible for many days after the terrorist attack to place a call from Staten Island if such call was transmitted via the telephone trunk lines in downtown Manhattan.
In any event, the defendants ultimately argue that all of the horror, heartbreak and hurdles for communications and commerce visited on Alexandra Bush and all New Yorkers in the aftermath of September 11th doesn’t matter, for the thrust of their motion is that a contract is a contract, and that since the cancellation call was received, at best, 13 days late, the plaintiff is not entitled, as a matter of law, to her refund. In an equitable bolster to its position, the defendants also assert that Micato imposes the cancellation penalties to cover costs which it incurs in planning and preparing for a customer’s safari. However, upon oral argument, defendants were unable to set forth what, if. any, expenses had been incurred towards plaintiffs trip, nor when such expenses were incurred. Thereafter, the defendants submitted, in an untimely manner, the further affidavit of Patricia Buffolano, dated June 7, 2002, restating the contention that, prior to receiving notice that Ms. Bush wished to cancel her trip, Micato was required to pay certain expenses. The affidavit, nonetheless, is silent as to when these expenses, and more specifically, whether any such expenses were incurred on or before September 14, 2001, whether any were incurred between September 14 and September 27, 2001 or whether any were incurred during the one-week delay between the time ProTravel received notification of the cancellation, September 27, 2001, and when Micato claims it received notification from ProTravel, October 4, 2001.
*747 When the residue has been poured away, the issue distilled here is whether the attack on the World Trade Center and the civil upset of its aftermath in the days that immediately followed excuses Alexandra Bush’s admittedly late notice of cancellation. More to the point, given that effective cancellation on or before September 14, 2001 would have absolved the plaintiff of the 20% cancellation penalty, does Ms. Bush’s sworn statement that she attempted to phone her cancellation notice to ProTravel beginning on September 12, 2001 but did not get through until September 27, 2001 raise a triable issue of fact, which, if resolved in her favor, entitles her to relief from the cancellation penalty provision of the contract?
It is in this context that the motion for summary judgment brought on by the defendants must be considered and it is in this context that they, as the moving parties, must demonstrate that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law pursuant to CPLR 3212. Since summary judgment deprives the litigant of her day in court and is considered to be a drastic remedy, it should not be granted where there is any doubt as to the existence of a material and triable issue of fact. (See Krupp v Aetna Life & Cas. Co., 103 AD2d 252 [2d Dept 1984]; see also Rotuba Extruders v Ceppos, 46 NY2d 223 [1978]; Van Noy v Corinth Cent. School Dist., 111 AD2d 592 [3d Dept 1985].)
A movant for summary judgment has the burden to set forth evidentiary facts sufficient to entitle that party to judgment as a matter of law, tendering sufficient evidence to eliminate any material issues of fact. Failure to make such a showing requires denial of the motion. (Winegrad v New York Univ. Med. Ctr., 64 NY2d 851 [1985].) “[Office a moving party has made a prima facie showing of its entitlement to summary judgment, the burden shifts to the opposing party to produce evidentiary proof in admissible form sufficient to establish the existence of material issues of fact which require a trial of the action.” (Garnham & Han Real Estate Brokers v Oppenheimer, 148 AD2d 493, 494 [2d Dept 1989]; see Friedman v Pesach, 160 AD2d 460 [1st Dept], appeal dismissed 76 NY2d 935 [1990].)
Though it is true that the black letter of the law establishes the rule that “once a party to a contract has made a promise, that party must perform or respond in damages for its failure, even when unforeseen circumstances make performance burdensome” (Kel Kim Corp. v Central Mkts., 70 NY2d 900, 902 [1987]), the rule is not an absolute. Where the “means of performance” have been nullified, making “performance *748 objectively impossible,” a party’s performance under a contract will be excused. (Id. at 902; see Conversion Equities v Sherwood House Owners Corp., 151 AD2d 635, 636 [2d Dept 1989].)
Counsel for the defendants at oral argument claimed to understand the difficulties encountered by literally every New Yorker in the wake of the disaster at the World Trade Center, but argue that those difficulties do not constitute a valid excuse for the failure of the plaintiff to cancel the safari before September 15, 2001. The delay until September 27, 2001, they contend, is inexcusable. Putting aside the sheer insensitivity of their argument, the argument fails to come to grips with Alexandra Bush’s sworn claim that the disaster in lower Manhattan, which was unforeseen, unforeseeable and, certainly, beyond her control, had effectively destroyed her ability and means to communicate a timely cancellation under the contract for safari travel she had booked through and with the defendants. To the point, Alexandra Bush claims she could not physically take the steps necessary to cancel on time. Micato and ProTravel, to the contrary, claim she was simply a traveler too skittish to travel after September 11th, who wanted to stick the travel professionals she had retained with the bill for her faint heart. Should the defendants establish that to be the case to the satisfaction of the jury or at a bench trial, they will be entitled to judgment. (See Evanoski v All Around Travel, 178 Misc 2d 693 [App Term, 2d Dept 1998].) They certainly have not established that as a matter of law now.
Furthermore, the plaintiffs claim of excuse because of the frustration of the means of performance is supported, underscored and punctuated by the official actions taken by civil authorities on September 11, 2001 and in the days that followed. On the day of the attack, a state of emergency had been declared by the Mayor of the City of New York, directing the New York City Commissioners of Police, Fire and Health and the Director of Emergency Management to “take whatever steps are necessary to preserve the public safety and to render all required and available assistance to protect the security, well-being and health of the residents of the City.” (NY City Legis Ann, at 355.)[1] Simultaneously, the Governor of the State of New York declared a state disaster emergency, directing state officials to “take all appropriate actions to * * * provide *749 * * * assistance as necessary to protect the public health and safety.” (Executive Order [Pataki] No. 113 [9 NYCRR 5.113] [2001].)[2]
*750 Particularly on the days at the focal point of the argument here, September 12, 13 and 14, 2001, New York City was in the state of virtual lockdown with travel either forbidden altogether or severely restricted. Precedent is plentiful that contract performance is excused when unforeseeable government action makes such performance objectively impossible. (See Matter of A&S Transp. Co. v County of Nassau, 154 AD2d 456, 459 [2d Dept 1989]; Metpath, Inc. v Birmingham Fire Ins. Co., 86 AD2d 407, 411-412 [1st Dept 1982].) Further, in the painful recognition of the obvious and extraordinary dimensions of the disaster that prevented the transaction of even the most time sensitive business during the days and weeks that followed the September 11th atrocities, the Governor even issued an Executive Order extending the statute of limitations for all civil actions in every court of our state for a period well beyond the times Alexandra Bush claims to have communicated her cancellation and Micato acknowledges it received it. (Exec *751 utive Order [Pataki] No. 113.7 [9 NYCRR 5.113.7] [2001].)[3] In such light, to even hint that Alexandra Bush has failed to raise *752 a triable issue of fact by her argument that the doctrine of impossibility excuses her late cancellation of the safari she booked through ProTravel with Micato borders on the frivolous.
It is not hyperbole to suggest that on September 11, 2001, and the days that immediately followed, the City of New York was on a wartime footing, dealing with wartime conditions. The continental United States had seen nothing like it since the Civil War and, inflicted by a foreign foe, not since the War of 1812. Accordingly, it is entirely appropriate for this court to consider and follow wartime precedents which developed the law of temporary impossibility. Stated succinctly, where a supervening act creates a temporary impossibility, particularly of brief duration, the impossibility may be viewed as merely excusing performance until it subsequently becomes possible to perform rather than excusing performance altogether. (See generally Annotation, Modern Status of the Rules Regarding Impossibility of Performance in Action for Breach of Contract, 84 ALR2d 12, § 14 [a] [1962].)
The law of temporary and/or partial impossibility flows from the theory that when a promisor has obligated himself to perform certain acts, which, when taken together are impossible, the promisor should not be excused from being “called upon to perform in so far as he is able to do so.” (Miller v Vanderlip, 285 NY 116, 124 [1941].) The First Department’s opinion in the World War I era case of Erdreich v Zimmermann (190 App Div 443 [1st Dept 1920]) is extremely instructive. In Erdreich, the plaintiff purchased German war bonds, which, at the time of purchase on December 14, 1916, was entirely lawful since the United States had not yet entered the conflict. Because of the war, however, the bonds could not *753 be delivered due to a naval blockade. In April 1917, after a state of war had been declared between the United States and Germany, the plaintiff demanded his money back for the defendant seller’s failure to deliver the bonds. Almost two years later, with the bonds essentially worthless, the plaintiff sued for rescission and return of his purchase payment. Appellate Term held that the delivery of the bonds, though legally contracted for, would have been unlawful under wartime rules and, therefore, the contract should have been rescinded for impossibility. The Appellate Division reversed, holding that “at most, performance of [the] contract was suspended during the existence of hostilities” (at 452), and the performance, which had been temporarily excused for impossibility during hostilities, was now required. The plaintiff was entitled, therefore, to his worthless bonds, but not the return of his purchase payment. This holding is in harmony with even earlier precedents acknowledging the fog of war and its upset of civil society:
“Where performance can be had, without contravening the laws of war, the existence of the contract is not imperiled, and even if performance is impossible the contract may still, when partly executed, be preserved by ingrafting necessary qualifications upon it, or suspending its impossible provisions [i.e., physical impossibility to cancel timely] * * * . If the contract * * * can be saved while the war lasts, it should be.” (Mutual Benefit Life Ins. Co. v Hillyard, 37 NJL 444, 468-469.)
So too here, if Alexandra Bush can establish objective impossibility of performance at trial, she is entitled to, at minimum, a reasonable suspension of her contractual obligation to timely cancel, if not outright excuse of her untimely cancellation.[4]
Clearly, the plaintiff has raised, in any event, sufficient material issues of fact concerning both her inability to cancel by September 15, 2001 the safari she had booked and the reasonableness of her cancellation on September 27, 2001, all as a result of the terrorist attack on the World Trade Center, the *754 damage the attack caused to communications and transportation in the City of New York and the actions of government in declaring and enforcing a state of emergency in the city and beyond. Moreover, the failure of the defendants to establish that they sustained any loss whatsoever on account of the plaintiffs failure to act in the 13-day intervening period between September 14 and September 27, 2001 further supports the reasonableness of the plaintiffs late cancellation as well as the court’s determination that triable issues of fact are present.
In the instant matter, the court finds that the plaintiff has raised sufficient material issues of fact concerning her inability to cancel the contract by September 15, 2001, which would, if established, provide a defense to the argument of the defendants, so as to warrant denial of this motion. Accordingly, for the reasons stated in the opinion of the court, the motion of defendants ProTravel and Micato for summary judgment dismissing this action is denied in its entirety.

. The full text of Mayor Rudolph W. Giuliani’s proclamation of a state of emergency is as follows:
“proclamation of a state of emergency
“Date: September 11, 2001
*749 “§ Í. Pursuant to the powers vested in me by Executive Law § 24,1 hereby declare a State of Emergency.
“§ 2. This State of Emergency has been declared because of terrorist attacks on the World Trade Center causing a great many deaths, injuries and extensive damage to buildings and infrastructure in Lower Manhattan. These conditions imperil the public safety.
“§ 3. During the State of Emergency, the following orders shall be in effect:
“a. All pedestrian and vehicular traffic, except essential emergency vehicles and personnel, shall be prohibited in the following areas: Manhattan-South of 14th Street.
“b. The occupancy and use of buildings in the following areas is prohibited: Manhattan-Below 14th Street, except for emergency or essential personnel who have been authorized by the Police Commissioner, Fire Commissioner or the Director of Emergency Management.
“c * * *
“§ 4. I hereby direct the Police, Fire and Health Commissioners and the Director of Emergency Management to take whatever steps are necessary to preserve the public safety and to render all required and available assistance to protect the security, well-being and health of the residents of the City.
“§ 5. Any person who knowingly violates any provision of this Order is guilty of a class B misdemeanor.
“§ 6. This Order shall take effect immediately. It shall remain in effect for 5 days unless it is terminated at an earlier date.
7s/_
“Rudolph W. Giuliani
“Mayor”
The proclamation by the Mayor was extended seasonably thereafter with no change in any of the declarations relevant to this action.

. The full text of Governor George E. Pataki’s Executive Order No. 113 declaring a state disaster emergency is as follows:
“No. 113
“executive order
“Declaring a Disaster Emergency in the State of New York
“whereas, unspeakable atrocities have occurred today in New York City, our nation’s capital and Pennsylvania that have taken the lives and injured unknown numbers of innocent people and have caused calamitous and pervasive damage to property; and
“whereas, these events appear to be deliberate and coordinated acts of terrorism committed by despicable and cowardly persons or groups unknown;
“now, therefore, i george e. pataki, Governor of the State of New York, do hereby find that a disaster has occurred for which the affected local governments are unable to respond adequately. Therefore, pursuant to the authority vested in me by the Constitution and the Laws of the State of New York, including Section 28 of Article 2-B of the Executive Law, I hereby declare a *750 State Disaster Emergency effective September 11, 2001 within the territorial boundaries of the State of New York;
“further, pursuant to Section 29 of Article 2-B of the Executive Law, I direct the implementation of the State Disaster Preparedness Plan and authorize, effective September 11, 2001 and continuing, the State Emergency Management Office, the Department of Transportation, the New York State Thruway Authority, the State Police, the Division of Military and Naval Affairs, the Department of Environmental Conversation, the Department of Health, the Office of Mental Health, the State Department of Correctional Services, the Public Service Commission, the Office of Fire Prevention and Control, the Department of Labor, the Office of Parks, Recreation and Historic Preservation and all other State agencies and authorities over which I exercise Executive authority to take all appropriate actions to assist in every way all persons killed or injured and their families, and protect state property and to assist those affected local governments and individuals in responding to and recovering from this disaster, and to provide such other assistance as necessary to protect the public health and safety; and
“further, I have designated Edward F. Jacoby, Jr., Director of the State Emergency Management Office (SEMO) as the State Coordinating Officer for this disaster. ,
“given under my hand and the Privy Seal of the State in the City of Albany this day eleventh of September in the year two thousand one.
“by the governor /s/ George E. Pataki
“/s/ Bradford J. Race, Jr.
“Secretary to the Governor”

. The full text of the Governor’s Executive Order of September 12, 2001 superceding statutes of limitations through New York State is as follows:
“No. 113.7
“executive order
“Temporary Suspension and Modification of Statutory Provisions Establishing Time Limitations on Actions and Time in which to Take an Appeal
“whereas, on September 11, 2001, I issued Executive Order Number 113 declaring a disaster emergency in the State of New York;
“now, therefore, i, george e. pataki, Governor of the State of New York, by virtue of the authority vested in me by the Constitution and Laws of the State of New York, do hereby continue Executive Order No. 113, dated September 11, 2001, except that such Executive Order is amended to read as follows:
“further, pursuant to the authority vested in me by Section 29-a of Article 2-b of the Executive Law to temporarily suspend specific provisions of any statute, local law, ordinance, orders, rules or regulations, or parts thereof, of any agency during a State disaster emergency, if compliance with such provisions would prevent, hinder or delay action necessary to cope with the disaster, I hereby temporarily suspend, from the date the disaster emergency was declared, pursuant to Executive Order Number 113, issued on September 11, 2001 until further notice, the following laws:
“Section 201 of the Civil Practice Law and Rules, so far as it bars actions whose limitation period concludes during the period commencing from the date that the disaster emergency was declared pursuant to Executive Order Number 113, issued on September 11, 2001, until further notice, and so far as it limits a courts authority to extend such time, whether or not the time to commence such an action is specified in Article 2 of the Civil Practice Law and Rules;
“Section 5513 of the Civil Practice Law and Rules, so far as it relates to a limitation period that concludes during the period commencing from the date that the disaster emergency was declared pursuant to Executive Order Number 113, issued on September 11, 2001;
“Sections 30.10 and 30.30 of the Criminal Procedure Law, so far as it bars criminal prosecutions whose limitation period concludes during the period commencing from the date that the disaster emergency was declared pursuant to Executive Order Number 113, issued on September 11, 2001, until further notice;
“Sections 460.10, 460.30, 460.50 and Article 460 of the Criminal Procedure Law, so far as it relates to a limitation of time to appeal in which a limitation period concludes during the period commencing from the date that the disaster emergency was declared pursuant to Executive Order Number 113, issued on September 11, 2001, until further notice;
“In addition, I hereby temporarily suspend and modify, for the period from the date of this Executive Order until further notice, any other statute, local law, ordinance, order, rule or regulation or part thereof, establishing limitations of time for the filing or service of any legal action, notice or other process or proceeding that the courts lack authority to extend through the exercise of discretion, where any limitation of time concludes during the period commencing from the date that the disaster emergency was declared *752 pursuant to Executive Order Number 113, issued on September 11, 2001, until further notice.
“given under my hand and the Privy Seal of the State in the City of Albany this twelfth day of September in the year two thousand one.
“by the governor /s/ George E. Pataki
“/s/ Bradford J. Race, Jr.
“Secretary to the Governor”
By his amended order of October 4, 2001, the Governor extended the suspension of the statutes of limitations through October 12, 2001, giving yet additional factual support to the disaster conditions still obtaining in New York City at that time.

. Without resolving whether actions or omissions by one or both of the defendants in reliance upon the plaintiffs silence in the period September 12 through September 27, 2001 can, to any extent, work an equitable estoppel of the plaintiffs claim of impossibility, it is significant to note that the defendants have offered no proof either in the timely or untimely affidavits submitted by them on this motion that the position of either defendant changed in any detrimental way during the period the plaintiff claims she was objectively unable to communicate her cancellation order.