Seventh Regiment Armory Conservancy, Inc. v Knickerbocker Greys (2025 NY Slip Op 25191)

[*1]

Seventh Regiment Armory Conservancy, Inc. v Knickerbocker Greys

2025 NY Slip Op 25191

Decided on August 20, 2025

Civil Court Of The City Of New York, New York County

Zellan, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on August 20, 2025
Civil Court of the City of New York, New York County

Seventh Regiment Armory Conservancy, Inc., Petitioner(s)

against
The Knickerbocker Greys; "XYZ Corp.", Respondent(s)

Index No. LT-300293-23/NY

Rosenberg & Estis, P.C. (Michael Pensabene, John Amato, and Peter Kane, of counsel), of New York, NY, for petitioner
Himmelstein McConnell Gribben & Joseph LLP (David Hershey-Webb, of counsel), of New York, NY, and Howard Moss Rogatnick, of New York, NY, for respondent

Jeffrey S. Zellan, J.

Papers Numbered
Order to show Cause/ Notice of Motion and
Affidavits /Affirmations annexed 1
Answering Affidavits/ Affirmations 2
Reply Affidavits/ Affirmations 3
Memoranda of Law
Other — Papers in Motion Seq. Nos. 005-007 4-7
Upon the foregoing cited papers, the Decision/ Order of the Court is as follows:
By this proceeding, petitioner, an organization formed to preserve a local armory of well over 100,000 square feet of usable space seeks to evict respondent children's organization from a few hundred square feet of space that the parties do not dispute that respondent has enjoyed use of since 1902.[FN1]
The parties came to this action disputing relatively few facts, and dispute even less following the conclusion of discovery. In Motion Seq. Nos. 004 through 006, the parties each seek dispositions in their respective favors. In the manner and for the reasons set forth below, the Court grants each of the respective motions in part and denies them each in part pursuant to CPLR 3212(g), and finds that a trial on the narrow factual question of petitioner's interference claim is necessary to resolve this proceeding.
[*2]The Parties' Dispute and This Proceeding
This proceeding is the apparent end product of nearly two decades of discord involving two executive organs of the State, and a non-profit conservatory with both a common law mandate to act for public good and a contractual mandate to support "interpretive and/or educational programs related to the social aesthetic and military history of the building [at issue] and other topics to the extent practicable," unable or unwilling to resolve the use by another non-profit operating the nation's oldest afterschool educational program from that space for over 120 years of less than a thousand square feet in a building occupying an entire City block. (Master Lease, Ex. K., NYSCEF Doc. No. 59, at K-1).
The parties' dispute arises from petitioner's 2006 occupancy of the historic Seventh Regiment Armory, pursuant to a 99-year lease from the State. (Aff. in Supp., §§ 4-5). Although petitioner asserts that respondent Knickerbocker Greys "do not have (and never had) any occupancy rights to the subject premises, other than through an expired license that has nevertheless been revoked and terminated," petitioner also notes that the New York State Division of Military and Naval Affairs had "allowed" respondent use of space in the premises prior to petitioner's leasehold, and the parties do not dispute that respondents have occupied space in the premises since 1902. (Aff. in Supp., §§ 3 and 23; and Transcript, at 21-22). Petitioner argues that their lease granted them an unencumbered leasehold over all relevant portions of the Seventh Regiment Armory, and that petitioner granted respondent a series of licenses, which have expired. (Aff. in Supp., §§ 5-9). While respondent agrees that the purported licenses have expired, respondent disagrees that the licenses themselves govern. As respondent points out, petitioner's own "existing physical conditions assessment" of the Armory, based upon a July 1999 site inspection (itself made an exhibit to petitioner's master lease), notes several "military purposes and ancillary functions," which have "historically been housed and/or continue to operate" at the time, including "rooms reserved for the private use of the Knickerbocker Greys and other armory constituents." (Master Lease, Ex. N-1, NYSCEF Doc. No. 69, at 53-53 and 63). Amongst other documents respondent offers in support of their position is a 2022 letter from Senator Liz Kreuger to petitioner's president recounting a 2006 meeting between the Senator, her staff, and petitioner's president, stating:
Meeting notes taken by my Deputy Chief of Staff from our discussions in 2006 when the Armory was transitioning to becoming a leader in arts programming refer to the following assurance that you provided at that time:
"Finally, I was told the Conservancy views the organizations currently using the Armory, including the Knickerbocker Greys, as an 'integral part of the tradition and future of the Armory'."
My belief in the Armory serving as the Knickerbocker [Greys'] permanent home has not changed. I sincerely trust the commitment expressed and shared by the Conservancy has remained the same as well.
(Ltr. by Sen. Kreuger to Rebecca Robertson dated Apr. 4, 2022, NYSCEF Doc. No. 122, at 1).
Petitioner subsequently commenced this holdover proceeding to evict respondent. 
By decision and order dated March 12, 2024, the Court (Johnson, J.) denied the parties' respective motion and cross-motion (Motion Seq. Nos. 002 and 003) on the issues presently [*3]before the Court, with leave to re-submit upon the conclusion of discovery. The parties having now completed discovery, again both seek summary judgment.
The Legislature's Action
During the pendency of this proceeding, the Legislature passed, and the Governor signed, 2024 NY Laws ch. 659, entitled "An act authorizing the use of armories by legacy cadet corps programs." The stated purpose of the bill could not be clearer, stating that it is to "provide a legacy cadet corps program with meeting space and event space at a regimental armory which they have resided in." (Sponsoring Mem. of Assemblymember Bores, 2024 NY Laws ch. 659). In finding that "[c]adet corps have a special historical value in the development and expression of New York City's culture and heritage," that "have existed for many decades," and that "[j]unior cadet corps for (children) have helped bring discipline, comradery, and education to countless generations of New York City's youth," while having "remained at the same location since their creation, adding a rich and important cultural institution to many New York City neighborhoods," Chapter 659's sponsor noted that "[s]ince the COVID pandemic, there have been attempts to evict these cadet corps from their long-standing locations," and "[c]ombating these evictions," had attracted the Legislature's attention. (Id.). In the face of those eviction efforts, the sponsor noted that "[p]reserving the ability of cadet corps programs to operate out of their long-standing locations is in the interest of keeping cultural and historical institutions within New York City intact and in their neighborhoods." (Id.).
As defined, a legacy cadet corps program is "a cadet corps or organized militia program that has accessed or used a regimental armory located within a city that has a population of over one million people for over one hundred years during periods which are not periods of civil or military emergency," which the parties do not seriously dispute (and the Court expressly finds for purposes of this decision) includes respondent. 2024 NY Laws ch. 659 § 1 (codified as Military Law § 180-a(1)(l)). "On application of a legacy cadet corps program the lessee or the manager pursuant to the terms of the management agreement shall provide a proper and convenient room or rooms or other appropriate space in the armory," for the organization to "hold regular and special meetings and organizational social events of a private nature, without the payment of any charge or expense therefor, provided that such use does not interfere with the use by the lessee or the manager pursuant to the terms of the management agreement." 2024 NY Laws ch. 659 § 3 (codified as Military Law § 180-a(3)(c)(i)) (emphasis added). Pursuant to Chapter 659, upon a finding by the New York State Urban Development Corporation (also known as Empire State Development) that a group is a legacy cadet corps program (based upon criteria set by statute), such group is entitled to a separate negotiated agreement governing their use of armory space, which "shall be sufficient and suitable space for the current and uninterrupted operation, provided that it is no less than twelve hundred square feet for their headquarters." 2024 NY Laws ch. 659 §§ 3 (codified as Military Law § 180-a(f)) and 4 (codified as New York State Urban Development Corporation Act § 39(b)).[FN2]

[*4]Discussion
Petitioner has argued that Chapter 659 is not relevant to this proceeding. Petitioner also argues that, even if relevant, the meaning of Chapter 659 is ambiguous in that the statutory text does not require petitioner to provide respondent use of the space it has occupied since 1902 or any specific area within the Armory space at all and that any specific obligation is derived from respondent's "interpretation of the law," rather than the text itself. (Letter, NYSCEF Doc. No. 115, at 1). In fact, petitioner argues, the area provided to respondent should not come from the Petitioner's approximately 100,000 square feet of space at all, but rather, the 1,200 square feet of space to be allotted to the respondent should come from the space allocated for use as a women's homeless shelter or the small portion allocated to the Division of Military and Naval Affairs. (Transcript, at 4). Accordingly, petitioner argues, "nothing in the Legislation precludes Petitioner from evicting Respondent from the [area within the petitioner's space currently used by respondent]." (Letter, NYSCEF Doc. No. 133, at 1). Petitioner's arguments are unavailing.
The Court is guided by the bedrock "fundamental that a court, in interpreting a statute, should attempt to effectuate the intent of the Legislature." Matter of New York State Land Tit. Assn. v. New York State Dept. of Fin. Servs., 169 AD3d 18, 28 (1st Dept. 2019). The First Department has long been clear that in interpreting statutes, "the spirit and purpose of the act and the objects to be accomplished must be considered and given effect, and the literal meanings of words are not to be adhered to or suffered to defeat the general purpose and manifest policy intended to be promoted." Turner v. Dept. of Fin., 242 AD2d 146, 147 (1st Dept. 1988). See also, People v. Vespucci, 144 AD2d 48, 55 (2d Dept 1988) (director of the Organized Crime Task Force could apply for eavesdropping warrants because "literal construction" of a statute is inappropriate when it "circumscribes its application," and "fails to meaningfully incorporate as guiding criteria the policy objectives sought to be achieved by Congress in utilizing the statutory term" (citations omitted)], affd., 75 NY2d 434 (1990), cert denied, sub nom. Corrigan v. New York, 498 U.S. 814 (1990); and King v. Burwell, 576 U.S. 473, 493 (2015) (cautioning that courts should not interpret "statutes to negate their own stated purposes" in interpreting the Patient Protection and Affordable Care Act), quoting, New York State Dept. of Social Servs. v. Dublino, 413 U.S. 405, 419-20 (1973). 
Contrary to petitioner's assertions, Chapter 659 is clearly and unambiguously relevant to this proceeding. The Legislature was distinctly aware of this proceeding when it considered Chapter 659, as the supporting memorandum itself noted that "[c]ombating these evictions," had attracted the Legislature's attention. (Sponsoring Mem. of Assemblymember Bores, 2024 NY Laws ch. 659). Indeed, petitioner conceded at argument that the Legislature was aware. (Transcript, at 5). 
Further, even assuming arguendo that the Legislature's language in Chapter 659 was "ambiguous or inartful" (which the Court does not agree it is), courts have been quite unambiguous that "clear legislative intent" is the guiding star. Bogom-Shanon v. Altman, 85 Misc 3d 1100, 1104 (Civ. Ct., New York Co. 2024) (collecting cases). Here, it is abundantly apparent that the Legislature intended to halt petitioner's eviction efforts against respondent with the enactment of Chapter 659, and petitioner's concern about effects upon its stated goals for the [*5]Seventh Regiment Armory "did not trouble the Legislature." Brian Krist, Sealing the Bawdy House Door Open, 48 NYRPLJ 27 n. 12 (2020). The operative question then is whether the Legislature could do as it intended. The Court finds that it could.
Chapter 659 Does Not Constitute a Taking on the Facts Presented
Petitioner's objection that respondent's "interpretation of the law leads to an absurd and unconstitutional result," and that the State "cannot, by act of legislation alone, lawfully condemn petitioner's leasehold interest and then grant it to another party," misses the mark. (Letter, NYSCEF Doc. No. 115, at 2). Rather, the parties essentially argue whether petitioner ever had an unencumbered contractual expectation to the space occupied by respondent. Although that alternatively would have created factual questions necessitating a trial (and foreclosing summary judgment in favor of petitioner in any event), the Court finds that an actual resolution of that question is not necessary here because the Legislature's enactment of Chapter 659 is entirely in keeping with petitioner's contract with the State of New York to support "interpretive and/or educational programs related to the social aesthetic and military history of the building," precisely because respondent is an "educational program" and part of the "military history of the building." (Master Lease, Ex. K., NYSCEF Doc. No. 59, at K-1).
The plain text of petitioner's agreement with the State shows that the Legislature was empowered to consider whether petitioner should be "polishing the plaques of dead Greys while kicking out the live ones," and that "the sacrifices members of the Greys have made have been part of this building's history longer than anyone currently alive," in considering the policy questions underlying Chapter 659 and the contractually-mandated use of the armory to promote "educational programs related to the social aesthetic and military history of the building to the extent practicable," pursuant to the master lease itself. Daisy Levine, 'It's a Disgrace' — Bores, Kreuger Support Bill to Help Youth Cadet Group Retain Armory Home, Our Town, May 26, 2024 (quoting sponsoring Assemblymember Bores regarding what is now Chapter 659); and Master Lease, Ex. K., NYSCEF Doc. No. 59, at K-1.[FN3]
Petitioner may disagree with the legislative outcome, but that is beyond the Court's remit; petitioners relief lies in the Capitol not the Courthouse. See, Isaly v. Garde, 83 Misc 3d 379, 383 (Sup. Ct., New York Co.), stay denied, 2024 NY Slip Op 71498 (1st Dept. 2024) (collecting cases and noting that the court is "bound to apply the law as it exists, and as interpreted by controlling precedents and cannot usurp the role of the legislature or the Appellate Courts"). 
The Parties' License Agreements Cannot Waive the State's Stated Interest
Petitioner's other argument — that respondent disclaimed any other right or interest in the space at issue than that created by their license agreements — is also unavailing. (Aff in Supp., [*6]¶¶ 6-7). Even accepting that petitioner apparently sought, and respondent agreed to provide, respondent's waiver of any interests in the premises from any other source than the parties' license agreement, the Court cannot enforce such a waiver. New York law is clear that the Court may not as a general matter enforce contractual terms contrary to the public policy of the State, even in the face of the parties' apparent agreement. In particular, the Court of Appeals has long noted that "a party cannot in advance, make a valid promise that a statute founded in public policy shall be inoperative," especially terms which are likely to have been "the result of ignorance, improvidence, an unequal bargaining position or was simply unintended." John J. Kassner & Co. v. New York, 46 NY2d 544, 551 (1979). That should be particularly true here where petitioner is a non-profit charitable organization specially created and required to act in the public interest, as the Court of Appeals has long noted that "[a] corporation organized in the public interest, with a view to the public welfare, and in the expectation of benefit to the community, which is the motive of the State's grant, may accept the franchise," remains subject to scrutiny as to whether it works in the public interest. People v. North River Sugar Refining Co., 121 NY 582, 620 (1890). See also, Abrams v. Richmond County S.P.C.C., 125 Misc 2d 530, 533 (Sup. Ct., Richmond Co. 1984) (status as a charitable organization "confers a public benefit and therefore the institution must demonstrably serve and be in harmony with the public interest"). That respondent is also a charitable organization subject to the same questions the Court of Appeals noted in John J. Kassner & Co. and North River Sugar Refining Co. amplifies the public interest in the parties' agreements.
Here, petitioner offered contractual terms in its license agreements with respondent (at the very least in their enforcement) that may contradict the terms of the master lease, and assuredly (and more importantly) contradict the Legislature's clear intent in the matter at hand. Simply put, respondent's alleged waiver of any claimed right or privilege to occupy space in the Armory was beyond petitioner's remit to seek from respondent and, even if the parties believed they could enter into such an agreement, their mutual mistake as to petitioner's authority in this area nullifies their agreement. See, e.g., Lanzetta v. Shleppers Holdings LLC, 2023 NY Misc. LEXIS 31598, *2 (Civ. Ct., Bronx Co. Sept. 14, 2023) (noting that "fraud, coercion, or mistake in the formation of contract entered into by two consenting parties," of such gravity that it prevented the parties from coming to a meeting of the minds excuses performance) (emphasis added) [FN4]
Moreover, the Legislature's intervention extinguished petitioner's ability to enforce that [*7]term. See, e.g., United Calendar Mfg. Corp. v. Huang, 94 AD2d 176, 180 (2d Dept. 1982) ("The denial of relief to the plaintiff in such a case is not based on any desire of the courts to benefit the particular defendant...[w]hat is important is that the policy of the law be upheld."); and Metpath, Inc. v. Birmingham Fire Ins. Co., 86 AD2d 407,411 (1st Dept. 1982) ("There is ample authority holding that where performance becomes impossible because of action taken by government, performance is excused").
That executive agencies of the State may have supported petitioner's position during various times in the course of the parties' dispute does not alter the public interest analysis either. See, People v. Grasso, 42 AD3d 126, 142 (1st Dept. 2007) (noting that what the Executive "perceives to be the interest of the state cannot trump contrary determinations about the public interest made by the Legislature"). Indeed, the Court of Appeals has affirmed whether the Legislature's power in this area is waivable at all. Levine v. Long Island Railroad Co., 38 AD2d 936, 938 (2d Dept.), affd. without op., 30 NY2d 907 (NY), cert. denied, 409 U.S. 1040 (1972) The clear intent of the Legislature in permitting respondent's continued use of the premises as a matter of public policy governs here, regardless of petitioner's apparent desire for the space or the Executive's transient support of petitioner's position. 
Factual Questions Remain as to Petitioner's Claim of Interference
Summary judgment is, as often said, "a drastic remedy" and one of issue identification rather than issue resolution. Rotuba Extrduers, Inc. v. Ceppos, 46 NY2d 223, 231 (1978) (quotation omitted). In that vein, "[s]ummary judgment should not be granted where there is any doubt as to the existence of a triable issue." Manufacturers & Traders Trust Co. v. Cottrell, 71 AD2d 538, 543 (4th Dept. 1979), citing, Rotuba Extruders, supra. Petitioner asserts that evicting respondent from all space subject to petitioner's lease is necessary "to further its public goals," and that petitioner's planned work "cannot take place until the Conservancy is in possession of the subject Premises." (Aff. in Reply, ¶ 5). Arguably, that would constitute a basis to grant petitioner possession of the approximately one-half of one percent of the space of the Armory respondent occupies, as Chapter 659 entitles respondent to "a proper and convenient room or rooms or other appropriate space in the armory," for the organization to "hold regular and special meetings and organizational social events of a private nature, without the payment of any charge or expense therefor, provided that such use does not interfere with the use by the lessee or the manager pursuant to the terms of the management agreement." 2024 NY Laws ch. 659 § 3 (codified as Military Law § 180-a(3)(c)(i)) (emphasis added). Thus, the Court finds pursuant to CPLR 3212(g) that a trial on the limited question of whether respondent's occupancy of its present space in the Armory interferes with petitioner's use of the Armory pursuant to their [*8]master lease from the State.[FN5]

Conclusion
Much of petitioner's prayer for relief lies in the Capitol following the Legislature's unequivocal determination as the policymaking branch of the government in reflecting the common will, and not before the Court. Limited questions do remain however, and the parties will proceed to resolve them.[FN6]

Accordingly, it is
ORDERED that the parties' respective motions and cross-motions marked as Motion Seq. Nos. 004 through 006 are each granted in part and denied in part pursuant to CPLR 3212(g) in accordance with this opinion; and it is further
ORDERED that the parties appear for conference on September 17, 2025 at 9:30 a.m., at which time the parties should be prepared to discuss any remaining preliminary matters and to select a trial date.
This constitutes the Decision and Order of the Court.
Date: August 20, 2025
Hon. Jeffrey S. Zellan, J.C.C.

Footnotes

Footnote 1:While the parties differ a bit on the exact amount of square footage respondents occupy, even the most generous estimate equals less than one half of one percent of the usable space of the armory.

Footnote 2:After the instant motions were marked submitted, Empire State Development determined that respondent has "sufficiently demonstrated that [respondent] has used or occupied the Seventh Regiment Armory for over one hundred years, and (2) are a Legacy Cadet Corps Program within the meaning of Section 180-A of the New York State Military Law," which would be the separate finding contemplated by Chapter 659. (Ltr. dated May 1, 2025 by Joshua Bloodworth, NYSCEF Doc. No. 134).

Footnote 3:"The Court may take judicial notice of newspaper publications," and, in considering what was in the Legislature's mind in enacting Chapter 659, the Court should, and does, take notice of a newspaper publication quoting sponsors of the legislation at issue. Grebow v. City of New York, 173 Misc 2d 473 479 (Sup. Ct., New York Co. 1997) (taking judicial notice). This is especially true where the statement of which notice is being taken is not being considered for its underlying truth or accuracy, but merely that the statement was made. Cf., A.V.A. Carting Inc. v. Browning-Ferris Indus., 211 N.Y.L.J. 37, *36-37 (Sup. Ct., New York Co. 1994) (declining judicial notice). Moreover, the plaques themselves were discussed at oral argument. (Transcript, at 9).

Footnote 4:Respondent has also raised questions of duress in their execution of the license terms, alleging that petitioner imposed an "eleventh-hour threat to cancel" access to the Armory for a winter review with petitioner's knowledge that food, floral, musical, and other arrangements had already been contracted, and that petitioner leveraged that threat to demand the waiver language on a "take it or leave it" basis. (Aff. in Opp., ¶ 12). While the standard to void a contract for economic duress is high, "[a] contract may be voided on the ground of economic duress where the complaining party was compelled to agree to its terms by means of a wrongful threat which precluded the exercise of its free will," while "[t]he threatened exercise of a legal right cannot constitute duress." 767 Third Ave. LLC v. Orix Capital Mkts., LLC, 26 AD3d 216, 218 (1st Dept. 2006). Here, respondent asserts that the threat to cancel based on the waiver language of the license was a wrongful threat in that it inappropriately drove respondent to execute the license agreement. This might have been a potentially viable defense under the circumstances, however, as the Court has deemed the waiver language of the license to be void as against public policy, the asserted duress defense to the signing of such language is moot. Additionally, that the master lease terms included, as has been discussed at length, the requirement to support "interpretive and/or educational programs related to the social aesthetic and military history of the building [at issue] and other topics to the extent practicable," the same practicality questions (i.e., whether "such use does not interfere with the use by the lessee or the manager") for which there is a triable issue of fact would overlap with the duress defense in any event. (Master Lease, Ex. K., NYSCEF Doc. No. 59, at K-1).

Footnote 5:The Court need not determine at this time whether Chapter 659 would require petitioner to simply find other acceptable space in the Armory for respondent in the event petitioner succeeds at trial, and nothing in this decision should be read as having determined that question.

Footnote 6:
 "The Court is aware of the sharp disagreement between opposing sides over the allegations in this case," illustrated by "hotly-contested" motion practice. U.S. Equities Corp v. Cavadias, 74 Misc 3d 1226(A), *1 (Civ. Ct., Bronx Co. 2022). However, the Court reminds the parties, acting with the assistance of their able counsel, to recall their particular obligations as non-profits obliged to act in the public interest moving forward.