[891 NYS2d 260]

Italian Designer Import Outlet, Inc., Doing Business as Casa Italia, Plaintiff, v New York Central Mutual Fire Insurance Company et al., Defendants.

Supreme Court, Kings County, November 18, 2009

## APPEARANCES OF COUNSEL

*Boeggeman George & Corde, P.C. (Jordan W. Grossman* of counsel), for New York Central Mutual Fire Insurance Company,

defendant. *Drabkin & Margulies* (*Michael L. Tawil* of counsel), for Island Holding, LLC, defendant. *Abraham, Lerner & Arnold, LLP* (*James M. O'Connor* of counsel), for plaintiff.

### OPINION OF THE COURT

JACK M. BATTAGLIA, J.

On December 7, 2005, plaintiff Italian Designer Import Outlet, Inc., doing business as Casa Italia, was engaged in the business of selling men's clothing at retail at 1376 Coney Island Avenue, premises owned by defendant Island Holding, LLC, and was insured under a business owners special policy, providing business personal property coverage, issued by defendant New York Central Mutual Fire Insurance Company. On that day, plaintiff alleges, a steam pipe that burst caused water damage to its inventory of at least $229,464.62. When New York Central denied coverage under the policy for any loss above $2,500, this action ensued.

Defendant New York Central now moves for an order, pursuant to CPLR 3212, "dismissing all claims and cross claims against it." (Notice of motion dated Apr. 21, 2009.) Defendant contends that its policy "only covers business personal property owned by the insured," and that "there is no coverage under the insurance policy for the damaged merchandise owned by Cantoni and held on consignment in the plaintiff's store." (Affirmation in support ¶¶ 5, 23.) The reference is to Cantoni I.T.C. USA, Inc. (Cantoni USA), and a consignment agreement, dated September 8, 2003, which, according to the deposition testimony of plaintiff's principal, Alain Elmkies, governed plaintiff's transactions with Cantoni USA.

Plaintiff opposes on the grounds that New York Central fails to establish prima facie with evidence in admissible form "whether the particular items of inventory damaged were obtained on consignment or purchased outright," and "[r]egardless of whether the particular items damaged were purchased outright or on consignment and displayed in plaintiff's store for resale, they were covered for the damages sustained." (Affirmation in opposition to defendant New York Central's motion for summary judgment ¶¶ 3, 37.)

Based upon the deposition testimony of Mr. Elmkies, which is not a model of certainty or clarity, but which New York Central submits and relies upon in support of its motion, defendant cannot dispute that the damaged goods for which plaintiff makes claim were not all supplied by Cantoni USA pursuant to the

consignment agreement. Mr. Elmkies testified that, although approximately 70% of plaintiff's inventory was supplied by Cantoni USA or was purchased directly from Cantoni USA's parent in Italy (Cantoni Italy), the balance of the inventory was supplied by manufacturers including Uomonuovo, Gucci, and Xegna. He described purchase transactions with the Cantoni companies where full payment for merchandise was made "up front," where half of the price was paid "up front," with the balance due within 60 days, and where payment was made after retail sale, if the merchandise was not returned.

But Mr. Elmkies could not specify the percentage of plaintiff's inventory supplied by Cantoni USA on consignment and the percentage purchased from Cantoni Italy, could not specify the percentage of Cantoni merchandise "own[ed] outright," and could not estimate the percentage of the approximately $229,000 claimed that "is a loss of goods that [plaintiff] owned versus a loss of goods that Cantoni owned." (Examination before trial of Alain Elmkies at 33, 125, 134.)

Since New York Central does not deny coverage for merchandise that was "owned" by plaintiff, and the evidence it has submitted on its motion at least creates a triable issue that some of the damaged goods for which claim is made were "owned" by plaintiff, defendant has clearly not established prima facie that it is entitled to summary dismissal of plaintiff's complaint. Moreover, since New York Central has not identified by description or value the merchandise that plaintiff held pursuant to the consignment agreement, then even if defendant is correct that such merchandise was not covered by its policy, defendant has not established prima facie that it is entitled to summary dismissal of plaintiff's claim to the extent of those goods. Assuming that New York Central is correct that "[u]ltimately, plaintiff cannot prove its case, unless they [sic] prove ownership of the damaged merchandise they [sic] seek to collect for" (reply affirmation ¶ 10), on this motion plaintiff need only raise a triable issue, and then only if defendant has made its prima facie showing.

But New York Central has not even established that it is entitled to judgment as a matter of law as to merchandise held by plaintiff for sale pursuant to the consignment agreement with Cantoni USA. New York Central's position rests on its interpretation of the business personal property coverage provided by the business owner's special policy that it issued to plaintiff. The court must note that defendant's counsel misquotes the

most important provision of the policy for present purposes when he quotes, "We cover your personal property in the described buildings." (Affirmation in support ¶ 6.) Rather, the coverage language reads, "We cover your *business* personal property in the described buildings" (emphasis added). As will appear, the omission is not immaterial. Nor is it immaterial that "owned" is not used to define coverage.

> "As with any contract, unambiguous provisions of an insurance contract must be given their plain and ordinary meaning . . .[A] contract is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion . . . Thus, if the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract . . . If the terms of a policy are ambiguous, however, any ambiguity must be construed in favor of the insured and against the insurer . . . Indeed, where a policy's terms are ambiguous, the insurer can prevail only if it can demonstrate not only that its interpretation is reasonable but that it is the only fair interpretation." (*Antoine v City of New York*, 56 AD3d 583, 584-585 [2d Dept 2008] [citations and internal quotation marks omitted].)

"The question of whether an insurance policy is ambiguous is a matter of law to be determined by the court." (*Board of Mgrs. of Yardarm Condominium II v Federal Ins. Co.*, 247 AD2d 499, 500 [2d Dept 1998].) "[T]he terms of an insurance contract are not ambiguous merely because the parties interpret them differently." (*Id.*) "In determining whether a policy provision is ambiguous, the focus is on the reasonable expectations of the average insured upon reading the policy." (*Villanueva v Preferred Mut. Ins. Co.*, 48 AD3d 1015, 1016 [3d Dept 2008] [citations and internal quotation marks omitted]; *see also Antoine v City of New York*, 56 AD3d at 585 ["reasonable expectations and purposes of ordinary businesspeople when making ordinary business contracts"].)

> "An 'ambiguous' word or phrase is one capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages

and terminology as generally understood in the particular trade or business." (*Walk-In Med. Ctrs., Inc. v Breuer Capital Corp.*, 818 F2d 260, 263 [2d Cir 1987], quoting *Eskimo Pie Corp. v Whitelawn Dairies, Inc.*, 284 F Supp 987, 994 [SD NY 1968].)

"[W]hen the insurer fails to submit extrinsic evidence that resolves the ambiguity, the proper interpretation is an issue of law for the court and the ambiguity must be resolved against the drafter of the contract, the insurer." (*Kenavan v Empire Blue Cross & Blue Shield*, 248 AD2d 42, 47 [1st Dept 1998].)

It is essentially New York Central's contention that "business personal property" as used in the policy is clear and unambiguous, and that "property" means "ownership." Defendant supports its contention with other policy language, "We do not cover personal property owned by others," but, "You may apply an amount of up to $2,500 to cover personal property of others in your care." This limiting language, however, does not specify "business" property.

More importantly, there are other provisions that, at the least, reveal that "business personal property" is not unambiguously limited to property "owned" by the insured. The business personal property coverage provision states that it "includes . . . your interest in personal property of others to the extent of your labor, material and services." Since "business personal property" can exist in the "personal property of others," "ownership" in any exclusive sense is clearly not required. And whatever the "interest" created by "labor, material, and services," it would appear not to be commonly understood as "ownership."

The section of the policy that addresses "Valuation of Property Losses" states, "Merchandise that you have sold but not delivered will be valued at the selling price less all discounts and unincurred expenses." Since "business personal property" includes "merchandise . . . sold but not delivered," can coverage be fairly said to be limited, clearly and unambiguously, to "ownership"?

Under the heading "Loss Payment," the policy states, "We do not cover more than your insurable interest in any property." The statement can fairly be understood as implying that any property in which the insured has an "insurable interest" is covered, and plaintiff contends essentially that "business personal property" includes all its inventory, consigned or otherwise, because plaintiff has an "insurable interest" in it all.

(Affirmation in opposition to defendant New York Central's motion for summary judgment ¶¶ 44-51.) Insurance Law § 3401 defines "insurable interest" as including "any lawful and substantial economic interest in the safety or preservation of property from loss, destruction or pecuniary damage." It has long been settled that ownership is not required for an insurable interest. (*See Mord v New York Indem. Co.*, 216 App Div 252, 253 [2d Dept 1926], *affd* 244 NY 589 [1927].)

The court has little difficulty concluding that "business personal property" does not clearly and unambiguously mean "ownership" as New York Central contends. Defendant submits no extrinsic evidence to support a conclusion that the parties intended "business personal property" to mean what defendant says it means, or that plaintiff as an ordinary businessperson making an ordinary business contract would have so understood the scope of coverage. There is nothing in the record to suggest that New York Central assessed the premium for plaintiff's policy based upon a determination that one or more of plaintiff's suppliers "owned" some portion of plaintiff's inventory. Nor is there any suggestion of the availability to plaintiff of "Other Person's Business Personal Property Coverage" that would have insured inventory that would not be covered by New York Central's policy, or that it was ever considered necessary by plaintiff or its insurance agent.

The court's conclusion is not affected by the Appellate Division, First Department, dictum in *Stack's Rare Coins v Federal Ins. Co.* (199 AD2d 17 [1st Dept 1993]), relied upon by New York Central. Applying liability insurance policies that "exclude damage to the property of others while in the care, custody or control" of the insured, the court stated that the insurer "had the right to disclaim and not defend when plaintiff was sued for damages to a rare coin consigned to it" (*id.*). The court did not quote or describe the coverage provision of the policy, and, in any event, liability coverage and casualty coverage implicate different interests and understandings. The opinion does suggest, however, that under some circumstances, not disclosed by the opinion, goods "consigned" to an insured might not be "property" of the insured for purposes of coverage.

Courts have long struggled in various contexts to distinguish "true consignments" from "sale or return" transactions or from consignments intended as security. (*See Matter of Mincow Bag Co. [Kaye—Finale, Inc.]*, 29 AD2d 400, 401-402 [1st Dept 1968], *affd* 24 NY2d 776 [1969]; *Rahanian v Ahdout*, 258 AD2d

156, 157-159 [1st Dept 1999]; *Matter of Friedman*, 64 AD2d 70, 81-83 [2d Dept 1978]; *Bernadette, Joseph & Co. v Van Buren*, 212 App Div 702, 704 [3d Dept 1925]; *Glenshaw Glass Co. v Ontario Grape Growers' Mktg. Bd.*, 67 F3d 470, 475-476 [3d Cir 1995]; *United States v Nektalov*, 440 F Supp 2d 287, 298-300 [SD NY 2006].)

The most recent treatment of the issue by a New York appellate court is found in the Appellate Division, First Department, opinion in *Rahanian v Ahdout* (258 AD2d 156 [1999]):

> "In a consignment, the wholesaler delivers the merchandise to the merchant but retains the title to it. The merchant sells the goods basically as the agent of the owner. In a 'sale or return,' the wholesaler delivers the goods *and* title to the merchant. However, the merchant can return the merchandise (and the title) to the owner at the merchant's option. Obviously, the answer as to who has title, and the right of possession of the merchandise, will depend upon the type of sale contemplated. This is true despite the terminology the parties used to describe the transaction . . .

> "In a sale or return, there is a true sale in which title and risk of loss pass to the buyer-retailer and the buyer is entitled to retain *all* proceeds of a subsequent sale, liable to the seller only for payment of the purchase price . . . However, in a consignment, the purchaser acts more like an agent, with an option to take title upon the occurrence of certain conditions. . .

> "[A] true consignment sale is merely an 'agency with a bailment' and basically governed by the law of agency and service contracts." (*Id.* at 157-159.)

The mere reservation of title alone cannot make a transaction a "true consignment." "Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to reservation of a security interest." (UCC 2-401 [1].) The primary distinguishing factor is whether the "consignee" is acting as the "consignor's" agent, compensated by a commission on the retail price set by the consignor, rather than a fully-independent merchant, compensated by the difference between the price charged by the consignor and the retail price set by the consignee. (*See Rahanian v Ahdout*, 258 AD2d at 160; *Bernadette, Joseph & Co. v Van Buren*, 212 App Div at 704; *Glenshaw Glass Co. v Ontario Grape Growers' Mktg.*

*Bd.,* 67 F3d at 475; *United States v Nektalov,* 440 F Supp 2d at 298-299.)

Custom plays a particularly important role, since "true consignments" are the prevalent business arrangements for the sale of some goods. (*See Matter of Friedman,* 64 AD2d at 82 [art]; *United States v Nektalov,* 440 F Supp 2d at 299 [diamonds].) Indeed, the distinction between a "true consignment" and a "sale or return," and particularly custom in the trade, would explain the Appellate Division, First Department, opinion in *Stack's Rare Coins v Federal Ins. Co.* (199 AD2d 17 [1993]), relied upon by defendant.

There is nothing in the record on this motion that would suggest that men's clothing is customarily offered for sale at retail on "true consignment." Nor is there anything to suggest that plaintiff was "generally known by [his/its] creditors to be substantially engaged in selling the goods of others." (*See* former UCC 2-326 [3] [b]; UCC 9-102 [20] [A] [iii].) Prior to its amendment in 2001 (*see* L 2001, ch 84, § 10), article 2 of the Uniform Commercial Code, which governs contracts for the sale of goods, provided that goods held for sale "on consignment" by a person dealing in goods of the kind involved under a name other than the name of the consignor were subject to the claims of the consignee's other creditors, with certain specified exceptions. (*See* former UCC 2-326 [3].) One of the exceptions was where the consignee was "generally known by his creditors to be substantially engaged in selling the goods of others." (*See id.* subd [3] [b].) With the revision, those provisions of article 2 have been moved to article 9, dealing with security interests, with essentially the same result. (*See* UCC 9-102 [20]; 9-103 [d]; 9-109 [a] [4]; 9-319; UCC 9-319, Comment 2.) The quoted language, which now appears in article 9's definition of "consignment" with a substitution of "its" for "his" (UCC 9-102 [20] [A] [iii]), appears to be one test for determining whether goods of a kind are customarily offered for sale on "true consignment."

The nature of the relationship between Cantoni USA and plaintiff, i.e., principal/agent or seller/buyer, must be determined on this record from the consignment agreement and the deposition testimony of plaintiff's principal, Alain Elmkies. The consignment agreement is little more than a page long. It provides that merchandise will be supplied to plaintiff's "retail shop," that plaintiff "is responsible [for] the maintenance of the units . . . [and] will insure the merchandise against theft and

damage," that plaintiff "will inform Cantoni I.T.C. USA regarding the items sold and will send a correspondent check for the net sold amount[,] in the same time Cantoni I.T.C. will issue an invoice . . . with the correspondent clothes value," that Cantoni USA "remains the formal owner of all no-sold items except for the shirts that will be invoiced," that "[r]eturns will be authorized by Cantoni I.T.C. USA only in case of defaults," and "Cantoni I.T.C. USA will take back the un-sold units only in case of conclusion of the cooperation." There is also reference to an enclosed "selling price list," but there is nothing to indicate whether the specified prices were amounts plaintiff would pay or amounts a retail customer would pay.

Mr. Elmkies testified that goods received from Cantoni USA were accompanied by a "proforma invoice," and "whatever I sold, I will give him the amount of the cost." (Examination before trial of Alain Elmkies at 128-129.) Under the agreement, "the goods were on consignment and to be paid as sold, or as damaged, or anything in that nature"; if a garment were to be damaged, "I'm responsible for it." (*Id.* at 126-127.)

There is little in the consignment agreement or testimony of Mr. Elmkies that would support a conclusion that the transactions between plaintiff and Cantoni USA were "true consignments" and not "sale or return" transactions. That Cantoni would remain the "formal owner of all no-sold items" is at least as susceptible to meaning an understanding that, in "substance," the transaction was a sale, with title reserved only as security (*see* UCC 2-401 [1]). The restrictions on return to "authoriz[ation] by Cantoni I.T.C. USA only in case of defaults" and "only in case of conclusion of the cooperation," whatever they may mean, support, if not require, that understanding.

There is no language of agency in the consignment agreement, and no reference in the agreement or the deposition testimony to "commission." Mr. Elmkies' testimony that, on retail sale of a consigned item, plaintiff would pay the "cost" indicates quite the opposite. That plaintiff bore the risk of loss or damage to the "consigned" goods while in its possession is consistent with risk of loss on a "sale or return" transaction, where "the risk remains throughout on the buyer" (*see* UCC 2-327, Comment 3; *see also* UCC 2-327 [2]; 2-509 [1], [4]).

In sum, New York Central's submission on this motion establishes prima facie that the Cantoni consignment transactions were, at most, "sale or return" transactions and not "true consignments," even if the latter are not covered as "business personal property" under the policy it issued to plaintiff.

Returning, therefore, to the policy, even if New York Central were correct that "business personal property" includes only merchandise "owned" by plaintiff, there is coverage for the merchandise held for sale by plaintiff pursuant to the consignment agreement. The evidence establishes "sale or return" transactions under the agreement, if not, given the restrictions on return, outright sales. Again, "[i]n a sale or return, there is a true sale in which title and risk of loss pass to the buyer-retailer." (*Rahanian v Ahdout*, 258 AD2d at 158; *see also Levis v Pope Motor Car Co.*, 202 NY 402, 406-407 [1911].)

Beyond that, however, given the ambiguity in the policy, "business personal property" must be interpreted to the insured's benefit, and be deemed to include all merchandise held for retail sale in which plaintiff has an insurable interest. "It is well settled that when the provisions of an insurance contract are ambiguous, they are to be construed against the insurer." (*Matter of Nationwide Ins. Co. v Miscione*, 267 AD2d 312, 312-313 [2d Dept 1999].) Under the consignment agreement, plaintiff bore the risk of loss or damage to the Cantoni USA merchandise, and was required to insure it against theft and damage, giving plaintiff an insurable interest in the merchandise. (*See Sigola Mfg. v Dairyland Ins. Co.*, 124 AD2d 654, 654-655 [2d Dept 1986].) "In construing ambiguous language in a policy like this, the general rule is that insurance contracts are to be interpreted according to the reasonable expectations and purposes of ordinary businesspeople when making ordinary business contracts." (*Antoine v City of New York*, 56 AD3d at 585.) An ordinary businessperson purchasing casualty insurance coverage for "business personal property" for a retail business would understand this policy as providing coverage for all merchandise held for sale for which the "business" bears the risk of loss or damage.

It is clear that defendant cannot prevail on this motion. The only remaining question is whether the court should grant summary judgment on the coverage issue to plaintiff. (*See* CPLR 3212 [b], [e].) "[W]hen the insurer fails to submit extrinsic evidence that resolves the ambiguity, the proper interpretation is an issue of law for the court." (*See Kenavan v Empire Blue Cross & Blue Shield*, 248 AD2d at 47; *see also Ender v National Fire Ins. Co. of Hartford*, 169 AD2d 420, 421 [1st Dept 1991].) It was New York Central, of course, who sought resolution of the coverage issue as a matter of law, and "despite a mountain of paper discovery that has been exchanged in this case" as de-

fendant points out in reply (reply affirmation ¶ 5), it presents no extrinsic evidence that would point to any conclusion other than that coverage exists under this policy for the claimed loss.

Defendant's motion is denied. Summary judgment on the issue of coverage for "business personal property" is granted to plaintiff; plaintiff must yet satisfy all other conditions to payment under the policy.