[677 NYS2d 560]

Robert Kenavan et al., Plaintiffs, and Irving Schmookler, Respondent, v Empire blue Cross and Blue Shield, Appellant.

First Department, September 17, 1998

## APPEARANCES OF COUNSEL

*Whitney North Seymour, Jr.,* of counsel (*Craig A. Landy* and *Peter James Clines* on the brief; *Landy & Seymour,* attorneys), for respondent.

*Howard S. Wolfson* of counsel (*Robert A. Bicks, Patricia Anne Kuhn* and *Galina A. Krasilovsky* on the brief; *Whitman Breed Abbott & Morgan, L. L. P.,* attorneys), for appellant.

## OPINION OF THE COURT

NARDELLI, J.

Plaintiffs paid premiums for Medigap insurance (i.e., coverage for the 20% difference the patient is liable for when a doctor does not accept assignments from Medicare). In so doing, they believed that they would be covered for any difference in the amount paid by Medicare to the doctor and the reasonable amount billed. Defendant Empire failed to live up to its obligations under the policies and breached the insurance contracts. In the words of plaintiff Robert Kenavan at his deposition, "I got a policy that ain't being lived up to".

Medicare Part A covers in-patient hospitalization expenses for persons 65 years and/or older and the disabled. Medicare Part B covers certain doctors' services for the same persons (42 USC § 1395j *et seq.*). Under Part B, the Federal Supplementary Medical Insurance Trust Fund covers "80 percent of the reasonable charges for the services" after satisfaction of a deductible (42 USC § 1395*l* [a] [1]). The Medicare recipient is

responsible for the other 20% of approved charges (the coinsurance amount). "Participating providers" are doctors who accept assignment of claims directly from Medicare, agreeing to accept the allowable charges in full satisfaction of their bills so the patient is not responsible for any amount. Where doctors choose not to accept assignments (nonparticipating providers), the bill may be in excess of the Medicare-approved charge, subject to a statutory fee cap. While the patient is responsible for the entire bill, he or she may seek reimbursement from Medicare for the 80% that Medicare covers. Thus, Medicare will pay 80% of the "reasonable" charges after satisfaction of the deductible and the patient must pay the remainder. Various insurers offer policies offering supplemental insurance for the "gap" between the 80% of reasonable costs paid by the Federal Government and the 20% that the patient must pay. Hence the term "Medigap" insurance.

In 1985, Congress enacted the Gramm-Rudman-Hollings Act (Gramm-Rudman) to help cut the Federal deficit by requiring automatic deductions (called sequestrations) in certain Federal programs where Congress and the President could not agree on a budget projecting a prescribed reduction. The amounts of the deductions are determined annually in conjunction with the adoption of the Federal budget (*see,* 2 USC § 900 *et seq.*). Under these provisions, there have been reductions in Medicare payments of 1% in the period from March 1, 1986 to September 30, 1986; 2.324% in the period between November 21, 1987 and March 31, 1988; 2.092% between October 17, 1989 and March 3, 1990; 1.4% between April 1, 1990 and September 30, 1990; and 2% for the period from November 11, 1990 until December 31, 1990. There have been no Gramm-Rudman deductions since 1990. As part of this legislation, Congress expressly relieved Medicare patients *on assigned claims* to participating providers from any liability to their doctors for the Gramm-Rudman reductions in benefits. In effect, the doctors who accepted the assignments were deemed to have accepted payment "less any reduction in payment amount made pursuant to a [Gramm-Rudman] sequestration order, as payment in full" (2 USC § 906 [d] [3]).

The plaintiffs in this class action are beneficiaries under the defendant Empire Blue Cross and Blue Shield's (Empire) individual supplemental insurance (Medigap) policies who filed *unassigned* claims under Medicare Part B for benefits from the Federal Government and then from defendant under their Medigap policies for the period from March 1, 1986 to December

31, 1992 and whose benefits were reduced by provisions of Gramm-Rudman. Their claim, in short, is that Empire breached its Medigap insurance contracts with them by failing to increase the benefits to cover the increase in the coinsurance for which they were liable as a result of the reduced Medicare payments under Gramm-Rudman. Thus, plaintiffs allege they were treated by physicians and were told by the Federal Government thereafter that their Medicare Part B benefits had been reduced by the stated amounts for the various periods. When they submitted claims to Empire under their Medigap policies for reimbursement, they did not receive payment for the amounts represented by the Gramm-Rudman reductions, although, they contend, they were entitled to 100% reimbursement under the Medigap policies for the amounts paid by them.

Plaintiffs originally began this action in 1991 in State court. Defendant successfully moved to have it removed to the Federal Court on the ground that the complaint raised a Federal question to the extent that it asserted claims on behalf of members who were covered under employee benefit plans subject to the Employee Retirement Income Security Act of 1974 (ERISA). The Federal District Court dismissed the ERISA claims without prejudice, granted class certification, denied defendant's motion to dismiss and remanded the State law claims of all remaining non-ERISA class members to the Supreme Court, New York County.

■ In the order appealed from herein, the IAS Court granted plaintiffs' motion for summary judgment on the second cause of action for breach of contractual obligations, alleging that Empire failed to reimburse plaintiffs adequately under the express language and intent of its Medigap policies in that Empire refused to pay the deductions in the Medicare payments made as a result of the Gramm-Rudman sequestrations. We affirm.

The policies issued to the various members of the class are basically the same with some minor variations, not essential to the disposition herein. Thus, the Empire Tradition PLUS Medicare Supplement Program policy states that it "fills in * * * coinsurance amounts that Part A and Part B of the Federal Medicare Program do not pay for". The policy also states, in its general information section: "There are deductible and coinsurance amounts that you must pay and that is where this supplementary coverage helps you meet your bills," and that "The Medicare benefits described in this Contract * * * can be changed by an Act of Congress." In a separate policy

article explaining the extent of benefits supplementing Part B, the Tradition PLUS policy states:

"After you satisfy your Part B deductible, which only applies once each calendar year, Medicare will usually pay you 80 percent of the amount approved as the allowed charge for the service you received. * * *

"We will pay 20 percent of the allowed charge as determined by Medicare after you have satisfied your Medicare Part B deductible. If your bill is higher than the allowed charge, neither Medicare nor we will pay the difference nor will we pay anything if Medicare pays you 100 percent of its allowed charge."

The Enhanced Medicare Plus policy to which plaintiff Schmookler subscribed contains the same general statements that it "pays 20 percent of all Medicare Part B approved charges", that it "fills in the deductible and coinsurance amounts that Part A and Part B * * * do not pay for," and that there can be benefit changes by Act of Congress or when the Federal Government increases the deductible and coinsurance amount. The only difference between this policy and the Tradition PLUS policy is that the latter contains a provision for an automatic premium increase whenever the Federal Government mandates an increase in the deductible or coinsurance amounts. Otherwise all the policies contain similar language. Thus, all of the policies contain language limiting coverage to the patient's obligation to pay:

"We will not cover any service if it is usually provided without charge to the patient. For example, when a provider of care does not usually collect charges in the absence of insurance coverage no benefits are provided. This exclusion applies even if charges are billed.

"In no event will the total of the Medicare payment plus our payment under this Contract be more than the Medicare allowed charge for the services received or the provider charges for the service."

Defendant Empire issued brochures that are also part of the record. These promotional brochures state that payments under the Medigap policies "will be automatically updated whenever the Federal government makes changes in Medicare deductibles and copayments." They also promise to provide the Medicare beneficiary with "the total protection you need when serious medical problems arise" and promise to provide Medigap benefits "which would be always current, always equitable in these uncertain times."

Insurance Law § 3218 (c) provides that: "No authorized insurer shall issue or deliver in this state any medicare supplemental insurance policy other than a medicare supplemental insurance policy which includes the minimum standards as approved by the superintendent."

The regulations of the New York Insurance Department in effect during the relevant coverage period required that all Medigap insurance policies be changed to automatically coincide with any changes in the applicable Medicare deductible and copayment amounts (11 NYCRR 52.22, as made applicable to Part B by 11 NYCRR 52.11).

Defendant asserts that Gramm-Rudman by its terms did not make any changes in coinsurance or deductibles and that, although technically the act effectively increased the patient liability *above* the original 20% in unassigned cases, there was no "increase" and it, therefore, was not obligated to fill any gap. As found by the IAS Court, however, this is simply an exercise in semantics.

Prior to Gramm-Rudman, the beneficiaries of the policies were responsible for no more than 20% of the reasonable charges. Following its enactment, they became responsible for paying *more* than 20% of the Medicare-approved charges, which triggered the obligation of Empire to increase coverage under the terms of the policies and the regulations of the Insurance Department.

While defendant asserts that the language in the policies unambiguously restricts payment to 20% of the Medicare-approved charge, we agree with the IAS Court that the language of the policies is ambiguous and would lead the average person to believe that Empire would reimburse the policyholder for expenses *not* reimbursed by Medicare, up to the Medicare-approved charge. Since evidence introduced by the parties extrinsic to the policies was not dispositive of the issue, the IAS Court also properly relied on the doctrine of *contra preferentum*, under which any ambiguity is liberally construed in favor of the insured and against the insurer (*Sincoff v Liberty Mut. Fire Ins. Co.*, 11 NY2d 386). Thus, when the insurer fails to submit extrinsic evidence that resolves the ambiguity, the proper interpretation is an issue of law for the court and the ambiguity must be resolved against the drafter of the contract, the insurer (*State of New York v Home Indem. Co.*, 66 NY2d 669, 671). While Empire asserts that the extrinsic evidence, i.e., other "carve-out" policies issued by it, which are worded explicitly to cover amounts not paid by Medicare,

exclude any interpretation of the instant policies that would cover these amounts, these "carve-out" policies do not reflect the "meeting of minds" of the two parties to the instant insurance contracts. Thus, even if Empire intended *not* to cover such Gramm-Rudman deductions, this was a subjective intent that was not made known to the policyholders herein, who are not charged with reading *all* the policies issued by the insurer, but only the terms of their *own* policies.

Even if the doctrine of *contra preferentum* did not apply, the regulations of the Insurance Department, cited above, require that the insurer cover increases in the Part B coinsurance amount (11 NYCRR 52.22). This requirement is included in the policies in issue by the provisions of Insurance Law § 3218 (c), which provides that Medicare supplemental insurance policies must include the minimum standards as approved by the Superintendent.

Defendant also asserts that even if it breached the contracts of insurance, the IAS Court erred in entering a final judgment for over $3,000,000 where plaintiffs failed to prove that they suffered damages. Thus, defendant contends that the class members have not shown and will not be required to show that they actually *paid* the increased Gramm-Rudman amounts but will, nevertheless, receive reimbursement. However, again Empire engages in semantics. The IAS Court accepted the same proof of payment that defendant Empire accepts under its own Medigap contracts with plaintiffs and members of the class. The court required each member of the class to come forward with documentary evidence of entitlement to reimbursement. All the insurer's policies require the insureds to submit claim forms for the Medigap coverage. The IAS Court correctly found that these claim forms were sufficient proof, since the strict degree of proof Empire contends is necessary, i.e., actual checks and a dollar-for-dollar comparison with the physicians' bills, was *not* required for the initial claims that would have been paid had Empire not breached *its* contracts. Thus, the court strictly followed the requirements of Empire itself in paying submitted claims under the policies. Furthermore, in the case of the elderly and disabled plaintiff class, the added requirement for more detailed proof would be particularly onerous and would discourage claims for the relatively minor gap amounts in issue for each claimant.

▪ Finally, defendant asserts that the IAS Court erred in requiring that any excess funds escheat to the State. However, this argument is deficient for the same reasons that undermine

Empire's demand for more documentation of payment than the original claim forms signed by both insureds and doctors. Empire has made an assumption that benefits are not due under the insurance contracts until the claimants submit proof entitling them to reimbursement and that, therefore, any unclaimed funds would not be "issued and payable" under Abandoned Property Law § 1316 (1). However, the benefits were *due* in the past under the contracts of insurance, and the amount of the Common Fund was arrived at based on information in the Medicare claim forms signed by both the patients and physicians, which, in itself, establishes entitlement to benefits. All the monies in the Common Fund were, therefore, "issued and payable" benefits and "held or owing by a domestic insurer" (*ibid.*) at the time of the breach of contract by Empire.

We have examined the remaining contentions of defendant and find them to be without merit.

Accordingly, the partial judgment of the Supreme Court, New York County (Beatrice Shainswit, J.), entered September 2, 1997, which found defendant liable with respect to the second cause of action for breach of contract, and the final judgment, same court and Justice, entered December 19, 1997, awarding the plaintiff class $3,105,200.56, plus costs in connection with the class action distributions, should be affirmed, with costs and disbursements.

MILONAS, J. P., WALLACH and SAXE, JJ., concur.

Judgments, Supreme Court, New York County, entered September 2, 1997 and December 19, 1997, affirmed, with costs and disbursements.