**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 29, 2011

No. 10-30190

Lyle W. Cayce
Clerk

JEFFERSON BLOCK 24 OIL & GAS, L.L.C.,

Plaintiff–Appellant,

v.

ASPEN INSURANCE UK LIMITED; ACE EUROPEAN GROUP LIMITED; CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, subscribing to Policy 07835N6717,

Defendants–Appellees.

Appeal from the United States District Court
for the Eastern District of Louisiana

Before GARZA and BENAVIDES, Circuit Judges, and LYNN*, District Judge.

LYNN, District Judge:

In this insurance coverage dispute, Plaintiff–Appellant Jefferson Block 24 Oil & Gas, L.L.C. (Jefferson Block) appeals from the district court's grant of summary judgment in favor of Defendants–Appellees, Aspen Insurance UK Limited, Ace European Group Limited, and Certain Underwriters at Lloyd's, London (collectively Underwriters). For the following reasons, we REVERSE and REMAND.

---

\* District Judge of the Northern District of Texas sitting by designation.

No. 10-30190

# I

At all times relevant to this appeal, Jefferson Block was the part-owner, and sole operator, of seven offshore oil and gas leases, an associated platform, wells, and pipelines located in the Gulf of Mexico. The leases were divided between two different lease blocks located in the High Island area. Two of the leases, M-103384 and M-103385, were located in the High Island 7 lease block, and the five others, M-103386, M-103387, M-103388, M-103389, and M-103390, were located in the High Island 24 lease block. Jefferson Block also operated a 16-inch right-of-way oil pipeline that connected an offshore production facility located on one of the leases in the High Island 24 lease block, M-103387, with a facility on shore. In reaching its destination, the pipeline crossed other lease blocks, including High Island 7, where Jefferson Block operated certain leases, and several others where it held no interests.

On November 5, 2007, there was a sudden decrease in pressure in the 16-inch pipeline while Jefferson Block was filling the pipeline with oil. An investigation revealed that a leak had developed in the line, resulting in the spill of oil into the Gulf of Mexico. Jefferson Block, acting under the direction of a "Unified Command" consisting of the United States Coast Guard and other governmental agencies, conducted a cleanup of the spill, during which it incurred approximately $3 million in oil pollution "removal" costs.

At the time of the pipeline leak and the resulting cleanup, Jefferson Block owned a "London OPA Insurance Policy for Offshore Facilities" (the OPA Policy) underwritten by Underwriters. Underwriters' potential exposure under the OPA Policy is limited, however, to only certain liabilities that Jefferson Block incurred "as the responsible party Designated Applicant of the offshore area(s) and facility(ies) set out in Item 10 of the Declarations." An additional proviso in the OPA Policy provides that the policy only covers certain liabilities arising from

No. 10-30190

a "discharge or substantial threat of discharge as to which a facility (or facilities) set out in Item 10 of the Declarations has been designated as the source."

Item 10 of the Declarations consists of only a single sentence: "Item 10: Schedule of Offshore Area(s) and Facilities Thereon: (See attached form MMS-1021)." The MMS-1021 form itself, discussed in further detail below, is titled "Covered Offshore Facilities," and lists "2 Locations of Covered Offshore Facilities." Specifically, the form lists Lease Numbers M-103384 to M-103385 in the High Island 7 lease block on one line and Lease Numbers M-103386 through M-103390 in the High Island 24 lease block on a second line. The MMS-1021 form does not specifically reference the 16-inch pipeline.

Jefferson Block submitted a claim under the OPA Policy for indemnification of the removal costs it incurred in responding to the pipeline leak. Underwriters denied the claim, and Jefferson Block filed suit against Underwriters in the Eastern District of Louisiana. Specifically, Jefferson Block alleged that Underwriters wrongfully refused to indemnify it for oil pollution removal costs. The parties thereafter filed cross-motions for summary judgment, and the district court, after concluding that the OPA Policy did not cover the costs Jefferson Block sustained as a result of the leak in the 16-inch pipeline, granted Underwriters' motion, denied Jefferson Block's motion, and entered judgment in favor of Underwriters. This appeal followed.

## II

We review the district court's grant of summary judgment de novo, applying the same standards as the district court. DePree v. Saunders, 588 F.3d 282, 286 (5th Cir. 2009). "The district court's interpretation of an insurance contract is a question of law that we also review de novo." Admiral Ins. Co. v. Ford, 607 F.3d 420, 422 (5th Cir. 2010) (internal quotation marks and citation omitted). Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine

No. 10-30190

issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). "A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Paz v. Brush Engineered Materials, Inc., 555 F.3d 383, 391 (5th Cir. 2009) (internal quotation marks and citations omitted). "When assessing whether a dispute to any material fact exists, we consider all of the evidence in the record but refrain from making credibility determinations or weighing the evidence." Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co., 530 F.3d 395, 398-99 (5th Cir. 2008). "In reviewing the entire record, we consider all evidence in a light most favorable to the non-moving party and draw all reasonable inferences in favor of the non-moving party." Frakes v. Crete Carrier Corp., 579 F.3d 426, 429-30 (5th Cir. 2009) (internal quotation marks and citation omitted).

## III

This case presents an insurance coverage dispute  governed by New York law.[1] "It is well established under New York law that a policyholder bears the burden of showing that the insurance contract covers the loss." Morgan Stanley Grp., Inc. v. New England Ins. Co., 225 F.3d 270, 276 (2d Cir. 2000). A court interprets an insurance policy using the same general rules that govern the construction of any written contract. See Throgs Neck Bagels, Inc. v. GA Ins. Co. of N.Y., 671 N.Y.S.2d 66, 68 (App. Div. 1998). In a case like this one, the analysis proceeds in three steps.

First, the court considers the express language of the policy, construing that language "to effectuate the intent of the parties as derived from the plain meaning of the policy's terms." Andy Warhol Found. for the Visual Arts, Inc. v. Fed. Ins. Co., 189 F.3d 208, 215 (2d Cir. 1999). When the contract language is

---

[1] An endorsement to the OPA Policy provides that "[t]he proper and exclusive law of this insurance shall be New York law."

4

unambiguous, the court will discern the parties' intent from the document itself as a matter of law, and summary judgment is thus appropriate. See id. ("If the language of the insurance contract is unambiguous, we apply its terms."); Sarinsky's Garage, Inc. v. Erie Ins. Co., 691 F. Supp. 2d 483, 485 (S.D.N.Y. 2010) ("Where the contract language is wholly unambiguous, summary judgment is appropriate."); Dryden Cent. Sch. Dist. v. Dryden Aquatic Racing Team, 600 N.Y.S.2d 388, 391 (App. Div. 1993) ("It is well settled that courts will first look to the express contract language used to give effect to the intention of the parties, and where the language of a contract is clear and unambiguous, the court will construe and discern that intent from the document itself as a matter of law." (citations omitted)). If the court concludes that the policy is ambiguous, however, it should proceed to the second step.

Once the court has concluded that the policy is ambiguous, the burden shifts to the insurer to prove that its proposed interpretation of the policy is the correct one. Morgan Stanley Grp., Inc., 225 F.3d at 276. At this stage, "the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." Id. at 275-76 (internal quotation marks and citations omitted). If the extrinsic evidence is "so one-sided that no reasonable person could decide the contrary," the court may resolve the ambiguity as a matter of law. Sarinsky's Garage, Inc., 691 F. Supp. 2d at 486 (internal quotation marks and citation omitted). "If it is not, the extrinsic evidence must be interpreted by the factfinder." Id.

Finally, if the insurer fails to submit extrinsic evidence that resolves the ambiguity, the proper interpretation is an issue of law for the court. Kenavan v. Empire Blue Cross & Blue Shield, 677 N.Y.S.2d 560, 563 (App. Div. 1998). Under such circumstances, a court should ordinarily resolve the ambiguity against the insurer. Id.; see also Morgan Stanley Grp., Inc., 225 F.3d at 276 ("'If the extrinsic evidence does not yield a conclusive answer as to the parties'

No. 10-30190

intent,' a court may apply other rules of contract construction, including the rule of contra proferentem, which generally provides that where an insurer drafts a policy 'any ambiguity in [the] . . . policy should be resolved in favor of the insured.'" (quoting McCostis v. Home Ins. Co., 31 F.3d 110, 113 (2d Cir. 1994))). With these principles in mind, we now turn to the instant dispute.

## A

We begin our analysis, of course, with the express language of the OPA Policy. Andy Warhol Found., 189 F.3d at 215. Before considering that language in detail, though, we note that "[a]lthough clear and unambiguous terms of an insurance policy must be given their plain and ordinary meaning, the language of an insurance policy must be construed with reference to the risk, subject matter and purpose of the policy." Show Car Speed Shop, Inc. v. U.S. Fid. & Guar. Co., 596 N.Y.S.2d 608, 609 (App. Div. 1993) (citations omitted). In this case, we believe that the subject matter and the purpose of the OPA Policy both shed important light on the meaning of the express terms of the policy, and, in order to aid our interpretation of the policy, we consider them first.

## 1

First, it is quite clear that the subject matter of the OPA Policy was Jefferson Block's potential liabilities under the Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq., (the Act). As the district court recognized, the OPA Policy was "replete with language that tie[d] it to [the Act]." Indeed, the Insuring Agreement to the OPA Policy expressly provides for indemnification for various types of liabilities arising under "the Act," and Part V of the OPA Policy, entitled "Definitions," states in pertinent part: "Where the words 'the Act' are used in this Insurance Policy they shall mean the Oil Pollution Act of 1990 . . . ."

"The [Oil Pollution Act] was enacted in 1990 in response to the Exxon Valdez oil spill in Prince William Sound, Alaska, and was intended to streamline federal law so as to provide quick and efficient cleanup of oil spills, compensate

6

victims of such spills, and internalize the costs of spills within the petroleum industry." Rice v. Harken Exploration Co., 250 F.3d 264, 266 (5th Cir. 2001). As this court has previously noted, "[t]he [Act] imposes strict liability on parties responsible for the discharge of oil." Id. It provides:

> [E]ach responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages specified in subsection (b) that result from such incident.

33 U.S.C. § 2702(a). As relevant to this case, the Act also requires responsible parties to establish and maintain evidence of financial responsibility, referred to as OSFR.[2] 33 U.S.C. § 2716.

Importantly, with respect to offshore facilities, the Act only requires evidence of financial responsibility for those offshore facilities that have a worst-case oil spill discharge potential of more than 1,000 barrels of oil. 33 U.S.C. § 2716(c)(1)(A). Such facilities are known as covered offshore facilities (COFs), and regulations promulgated by the Department of the Interior's Minerals Management Service (MMS)[3] "establish[] the requirements for demonstrating OSFR for covered offshore facilities (COFs) under [the Act]." 30 C.F.R. § 253.1 (2010). The regulations define such facilities thus:

> Covered offshore facility (COF) means a facility:
>
> (1) That includes any structure and all its components (including wells completed at the structure and the associated pipelines),

---

[2] "Oil Spill Financial Responsibility (OSFR) means the capability and means by which a responsible party for a covered offshore facility will meet removal costs and damages for which it is liable under [the Oil Pollution Act] with respect to both oil-spill discharges and substantial threats of the discharge of oil." 30 C.F.R. § 253.3 (2010).

[3] On June 18, 2010, the Secretary of the Interior issued Order No. 3302, which changed the name of the Minerals Management Service to the Bureau of Ocean Energy Management, Regulation, and Enforcement. See Order No. 3302, 2010 WL 2543300 (June 18, 2010). Because this change occurred while this case was pending, in the interest of consistency we will continue to use the MMS designation.

No. 10-30190

equipment, pipeline, or device (other than a vessel or other than a pipeline or deepwater port licensed under the Deepwater Port Act of 1974 (33 U.S.C. 1501 et seq.)) used for exploring for, drilling for, or producing oil or for transporting oil from such facilities. This includes a well drilled from a mobile offshore drilling unit (MODU) and the associated riser and well control equipment from the moment a drill shaft or other device first touches the seabed for purposes of exploring for, drilling for, or producing oil, but it does not include the MODU; and

(2) That is located:

(i) Seaward of the coastline; or

(ii) In any portion of a bay that is:

(A) Connected to the sea, either directly or through one or more other bays; and

(B) Depicted in whole or in part on any USGS map listed in the Appendix to this part, or on any map published by the USGS that is a successor to and covers all or part of the same area as a listed map. Where any portion of a bay is included on a listed map, this rule applies to the entire bay; and

(3) That has a worst case oil-spill discharge potential of more than 1,000 bbls of oil, or a lesser volume if the Director determines in writing that the oil-spill discharge risk justifies the requirement to demonstrate OSFR.

30 C.F.R. § 253.3 (2010). One method of demonstrating OSFR for a COF is to provide evidence of insurance. 33 U.S.C. § 2716(e); 30 C.F.R. § 253.20 (2010). Both Jefferson Block and Underwriters agree that one of the purposes of the OPA Policy was to satisfy the MMS's requirements for demonstrating OSFR.

**2**

With its purpose and subject matter in mind, we now address the express language of the OPA Policy under which Jefferson Block seeks coverage of the 16-inch pipeline. Part 1 of the OPA Policy, entitled "Insuring Agreement," provides in pertinent part:

Part 1. INSURING AGREEMENT

No. 10-30190

> In consideration of the premium stated herein and subject to all of the terms, conditions and limitations contained herein, the Underwriters agree to indemnify the Assured for such amounts in excess of the Deductible set out in Item 3 of the Declarations (the "Deductible") as the Assured shall, as the responsible party Designated Applicant of the offshore area(s) and facility(ies) set out in Item 10 of the Declarations, have become liable to pay, and shall pay, by reason of or with respect to:

> **FIRST**: Liability under Section 1002 of the [Oil Pollution Act] for a discharge of oil as defined in Section 1001(23) of the Act, or the substantial threat of a discharge of oil into or upon the navigable waters or adjoining shorelines or the exclusive economic zone of the United States of America for [certain specified removal costs or damages].

Part 1 also includes several provisos, one of which requires "that the discharge or substantial threat of discharge" that gives rise to liability "is a discharge or substantial threat of discharge as to which a facility (or facilities) set out in Item 10 of the Declarations has been designated as the source pursuant to Section 1014(a) of the Act . . . ." For its part, Item 10 of the Declarations consists of a single sentence. It reads: "Item 10: Schedule of Offshore Area(s) and Facilities Thereon: (See attached form MMS-1021)."

The MMS-1021 form is a form created by the MMS, the branch of the Department of the Interior responsible for enforcing the OSFR requirements of the Act. A designated applicant[4] uses the MMS-1021 form to identify to the MMS the applicant's "covered offshore facilities to be covered by my application for certification of [OSFR]." One important characteristic of the MMS-1021 form is that the form asks only for the <u>locations</u> of an applicant's covered offshore facilities—not a list of the specific facilities themselves. The form is titled "Covered Offshore Facilities" and includes a table in which a designated

---

[4] The designated applicant is the "person the responsible parties designate to demonstrate OSFR for a COF on a lease, permit, or right-of-use and easement." 30 C.F.R. § 253.3 (2010).

applicant lists the locations of covered offshore facilities using the following identifiers: (1) the State or OCS Region; (2) the Lease Number; (3) the Aliquot Portion; (4) the Area Name; (5) the Block Number; (6) the Permit Number; (7) the Right of Use/Easement Number; (8) the Pipeline Segment Number; and (9) the Potential Worst-Case Oil Spill Discharge (in barrels).  As already discussed, Jefferson Block's MMS-1021 form lists Lease Numbers M-103384 to M-103385 in the High Island 7 lease block on one line and Lease Numbers M-103386 through M-103390 in the High Island 24 block on a second line.  The form assigns the High Island 7 block leases a worst-case discharge calculation of 1,000 barrels and the High Island 24 block leases a worst-case discharge calculation of 5,000 barrels.  The form includes no express reference to the 16-inch pipeline.

**3**

The district court, interpreting the OPA Policy during the proceedings below, reached the following conclusions with respect to the policy's language. First, the district court concluded that "the OPA policy clearly and unambiguously cover[ed] COFs located on the leases listed on the MMS-1021." The court went on to note, however, that "it [was] not clear whether the 16-inch pipeline [was] 'located' on these leases." Accordingly, the district court concluded that the OPA Policy is ambiguous with respect to whether the pipeline was located on the leases identified on the MMS-1021 form.

Jefferson Block contends on appeal that the district court erred in its interpretation of the OPA Policy and that the plain language of the OPA Policy unambiguously includes the 16-inch pipeline within the scope of its coverage. Jefferson Block's argument proceeds in three stages.  First, Jefferson Block notes that the Insuring Agreement provides for coverage of "the offshore area(s) and facility(ies) set out in Item 10 of the Declarations." Jefferson Block then points out that Item 10 of the Declarations directs the reader to the MMS-1021 form in order to determine the "Offshore Area(s) and Facilities Thereon" that the

No. 10-30190

Insuring Agreement covers.  Finally, Jefferson Block contends that the MMS-1021 form unambiguously identifies the High Island area as the "Offshore Area" to which coverage extends under the policy.  Jefferson Block argues:

> MMS-1021 identifies, *inter alia*, the "AREA NAME:" . . . as "HI."  It is undisputed that "HI" stands for "High Island."  There is no ambiguity here—MMS-1021 uses the word "AREA" only once, and that one time it identifies High Island as the "Area."  MMS-1021 does not identify any "facilities."  Therefore, the plain meaning of the Insuring Agreement and Item 10 of the Declarations is that coverage applies to the High Island Offshore Area and any "facilities" thereon.

Since there is no dispute that the 16-inch pipeline was a "facility" located entirely within the High Island offshore area,[5] Jefferson Block contends that the OPA Policy is unambiguous and extends coverage to the pipeline.

We reject Jefferson Block's argument, because its proposed interpretation of the OPA Policy conflicts with the express language of Item 10 and Jefferson Block's MMS-1021 form, as well as the purposes of the policy.

We begin our analysis with the plain language of Item 10.  Jefferson Block's  first argument presumes that, for an insured to obtain coverage of a facility, Item 10 only requires that the insured designate the offshore area on which that facility is located.  Item 10, however, references a schedule of "Offshore Area(s) <u>and Facilities Thereon</u>."    Jefferson Block's proposed interpretation—that simply designating an offshore area is sufficient to extend coverage to all facilities in that area—renders meaningless Item 10's reference to "Facilities Thereon."  <u>Cf.</u> <u>Ruttenberg v. Davidge Data Sys. Corp.</u>, 626 N.Y.S.2d

---

[5] The OPA Policy does not define "facility," but the definitions section of the policy expressly provides that all "terms and phrases used herein shall, unless otherwise stated, have the meaning given to them in the [Oil Pollution Act]."  The Act defines facility as "any structure, group of structures, equipment, or device (other than a vessel) which is used for one or more of the following purposes: exploring for, drilling for, producing, storing, handling, transferring, processing, or transporting oil.  This term includes any motor vehicle, rolling stock, or pipeline used for one or more of these purposes."  33 U.S.C. § 2701(9).

174, 177 (App. Div. 1995) ("It is a recognized rule of construction that a court should not adopt an interpretation which will operate to leave a provision of a contract . . . without force and effect." (internal quotation marks and citations omitted)). Item 10 contemplates not just the designation of an offshore area, but also the designation of facilities located within that offshore area. That the OPA Policy includes a proviso that limits coverage to "a discharge or substantial threat of discharge as to which a <u>facility (or facilities)</u> set out in Item 10 of the Declarations has been designated as the source" only buttresses this conclusion.

Second, Jefferson Block's argument also fails to account for the fact that Item 10, by naming MMS-1021 as the "Schedule of Offshore Area(s) and Facilities Thereon," incorporates into the insurance contract the entire MMS-1021 form, not just the parts of the form that reference the High Island area. The MMS-1021 form is entitled "COVERED OFFSHORE FACILITIES," and proceeds to list the locations of covered offshore facilities "to be covered by [Jefferson Block's] application for certification of oil spill financial responsibility." The form does not identify the locations of these covered offshore facilities through reference to an area name only, but also through reference to specific block numbers and lease numbers. By focusing only on the form's reference to the High Island area, Jefferson Block ignores these more specific identifiers. Jefferson Block's argument also ignores the clear purpose of the MMS-1021 form—the identification of "covered offshore facilities" for which a designated applicant seeks to demonstrate OSFR.

In short, Item 10 exists to provide the schedule of offshore areas <u>and</u> the facilities in those offshore areas that the OPA Policy covers. Item 10 accomplishes this task by referencing the MMS-1021 form. And, as already noted, the MMS-1021 form exists to identify "covered offshore facilities" for which a designated applicant seeks to demonstrate OSFR. When we read them together, we believe that the import of Item 10 and MMS-1021 is

No. 10-30190

clear—Jefferson Block's OPA Policy provides coverage for covered offshore facilities at the locations identified on the MMS-1021 form.

"[E]very clause or word in an insurance contract is deemed to have some meaning, and a policy's terms should not be assumed to be superfluous or to have been idly inserted." Schumann v. State, 610 N.Y.S.2d 987, 990 (Ct. Cl. 1994) (internal quotation marks and citations omitted). Additionally, we must give due regard "to the risk and subject matter and the purpose of the policy." De Forte v. Allstate Ins. Co., 442 N.Y.S.2d 307, 309 (App. Div. 1981) (internal citation omitted). The interpretation of the OPA Policy that we adopt, which was the one adopted by the district court, comports with the plain language of the OPA Policy and promotes the purpose of the policy. Jefferson Block's interpretation does neither. Accordingly, we reject Jefferson Block's claim that the plain language of the OPA Policy unambiguously includes the 16-inch pipeline within the scope of its coverage.

**4**

Our rejection of Jefferson Block's plain language argument does not end our inquiry, however. Rather, it simply re-frames the issue. Under the interpretation of the OPA Policy we adopt, the relevant issue is, as the district court correctly recognized, whether Jefferson Block's 16-inch pipeline was a covered offshore facility "located" on one of the lease blocks identified on the MMS-1021 form.

The district court observed that the answer to this question is anything but clear:

> The 16-inch pipeline began on Jefferson Block's High Island 24 lease M-103387 where it was connected to platform 24A, but it ran 6 miles to the shore. To get to that termination point on shore, the pipeline crossed High Island 90, 89, 75, 76, 67, and 66, where Jefferson Block had no leasehold interests. A map of the area suggests that nearly 3/4's of the pipeline was located outside of the leases that Jefferson Block listed on MMS-1021. The pipeline

13

crossed these other properties pursuant to an easement that had been granted by the Texas General Land Office. Thus, it is not so clear that the 16-inch pipeline can fairly be described as a facility "located" on the leases listed on MMS-1021. Likewise, it is not so clear that the pipeline is *not* "located" on those leases because some portion of the 16-inch pipeline undisputedly spans Jefferson Block's leases.

The district court went on to explain that the OPA Policy is "ambiguous because the meaning of 'located' is reasonably susceptible to more than one interpretation." Accordingly, the court resolved to consider extrinsic evidence in order to determine whether the parties intended the 16-inch pipeline to be a facility within the designated locations on the MMS-1021 form.

Although we note that the particular term that the district court determined was ambiguous—"located"—does not appear in the OPA Policy, we agree with the district court's more basic point. Specifically, whether the pipeline was a covered offshore facility "located" on (or more properly "thereon") one of the lease blocks identified on the MMS-1021 form cannot be determined through reference to the OPA Policy alone. Because the OPA Policy is thus capable of two different interpretations—one in which the pipeline is located on the leases listed on the MMS-1021 form and one in which it is not—we agree with the district court that the policy is ambiguous as a matter of law. See Andy Warhol Found., 189 F.3d at 215 ("Where its terms are reasonably susceptible to more than one interpretation, the policy must be regarded as ambiguous."). Accordingly, as did the district court, we proceed to step two of New York's interpretation framework and consider extrinsic evidence in an attempt to resolve the ambiguities in the policy. Id. ("When a court decides, after examination of the contractual language, that an insurance policy is ambiguous, it looks outside the policy to extrinsic evidence, if any, to ascertain the intent of the parties.").

No. 10-30190

**B**

As we have already noted, when a court determines that an insurance policy is ambiguous, "the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." Morgan Stanley Grp., 225 F.3d at 275-76 (internal quotation marks and citations omitted). Although the district court's order is not entirely clear on this point, it appears that the district court, after considering several pieces of extrinsic evidence, concluded that the extrinsic evidence established that the OPA Policy's coverage extends only as far as was necessary for Jefferson Block to demonstrate OSFR compliance to the MMS. Since the district court also concluded that the pipeline did not meet the MMS's definition of a covered offshore facility, thus relieving Jefferson Block from the requirement of demonstrating OSFR compliance for the pipeline, the district court also determined that the pipeline was not covered by the policy. For the reasons discussed below, we believe that the district court erred when it reached this conclusion and that none of the extrinsic evidence proffered by Underwriters serves to resolve the ambiguity with respect to coverage of the pipeline.

Since the OPA Policy is ambiguous with respect to coverage of the 16-inch pipeline, Underwriters bear the burden of proving the correctness of their interpretation of the policy—that the location designations in the MMS-1021 form do not include the pipeline. See id. at 276 ("If the court concludes that an insurance policy is ambiguous, then the burden shifts to the insurer to prove that its interpretation is correct."). Moreover, "[i]f the extrinsic evidence does not yield a conclusive answer as to the parties' intent, it is appropriate for a court to resort to other rules of construction, including the contra-insurer rule, which states that any ambiguity in an insurance policy should be resolved in favor of the insured." McCostis v. Home Ins. Co. of Ind., 31 F.3d 110, 113 (2d Cir. 1994).

15

No. 10-30190

We address first the extrinsic evidence that addresses whether the 16-inch pipeline was a "covered offshore facility" as that term is used in MMS-1021. The district court determined that the pipeline was not a "covered offshore facility" because extrinsic evidence in the record suggests that the 16-inch pipeline was not a COF under the applicable MMS regulations. Specifically, the district court referenced an expert report submitted by Jefferson Block, on which Underwriters also rely on appeal, that estimates a worst case discharge for the 16-inch pipeline of only 378.7 barrels. As we have already noted, a facility is only a COF that requires a demonstration of OSFR if it has a worst-case oil spill discharge potential of more than 1,000 barrels of oil. Since the MMS-1021 form is used to identify those facilities for which a designated applicant seeks to demonstrate OSFR, Underwriters argue—and the district court below agreed—that the pipeline is not included in the locations listed on the form because it was not a COF for which there existed a need to demonstrate OSFR.

As Jefferson Block points out, however, the expert report on which both the district court and Underwriters rely estimates a worst-case discharge for all of Jefferson Block's facilities in the High Island 24 lease block, including the pipeline, of only 666 barrels. If we follow Underwriters' argument to its logical conclusion, no facility on the High Island 24 lease block would qualify as a COF such that Jefferson Block needed to demonstrate OSFR. Thus, to the extent the expert report that Underwriters rely on establishes that the pipeline was not a COF for which Jefferson Block needed to demonstrate OSFR, the report also establishes that there were no COFs on the High Island 24 lease block. Yet, Jefferson Block identified its leaseholds in the High Island 24 lease block on the MMS-1021 form and indicated a potential worst-case discharge of 5,000 barrels. Accordingly, the only inference that one can draw from this expert report is that Jefferson Block sought voluntarily to include on its MMS-1021 facilities that were not actually COFs. Indeed, as Jefferson Block notes, Notices to Lessees

16

No. 10-30190

(NTL) published by the MMS expressly provide that a designated applicant may include on an MMS-1021 form facilities with a worst-case discharge potential of less than 1,001 barrels that are not COFs under 30 C.F.R. § 253.3.[6]  See NTL No. 2008-N05.  It would appear, then, that a facility can be a "covered offshore facility" listed on MMS-1021 without necessarily being a COF.  Thus, evidence that the 16-inch pipeline was not a COF provides no insight with respect to whether the pipeline was a non-COF facility that Jefferson Block sought to include on its MMS-1021 form, especially since it appears that none of the facilities on the High Island 24 lease block were COFs.

Underwriters also point to extrinsic evidence to support their argument that, whether the 16-inch pipeline was a COF or not, it needed to be listed separately on MMS-1021 in order for coverage under the OPA Policy to attach. Specifically, Underwriters note that NTL No. 2008-N05 states: "Each lease, permit, RUE, or pipeline is considered as a unique, separate COF.  On OSFR forms that require these COFs to be shown, each one must be listed on its own individual, single line."  Moreover, Underwriters argue, NTL No. 99-N01 provides an exception to this separate listing requirement for "lease term pipelines"—pipelines that are "wholly contained within the boundaries of a

---

[6] Underwriters make much of the fact that the relevant NTL prescribes a specific method for a designated applicant to indicate OSFR coverage for facilities with a worst case oil-spill potential under 1,001 barrels.  Specifically, NTL No. 2008-N05 provides that if a designated applicant wishes to demonstrate OSFR coverage for facilities that are not COFs, "the listed facility(s) must show a COF worst case oil-spill discharge volume of '<1,001' barrels in the appropriate column on the Form MMS-1021 and/or Form MMS-1022."  Underwriters argue that the fact that Jefferson Block did not list any facility with a worst-case discharge volume of "<1,001" on its MMS-1021 form indicates that Jefferson Block did not intend to include any facilities that were not COFs.  The problem with this argument, of course, is that, according to the expert report that Underwriters rely on, none of the facilities on the High Island 24 lease block had a worst-case discharge potential of greater than 1,000 barrels.  The implication of Underwriters' argument is thus that Jefferson Block did not intend to cover any of these facilities because it did not use the specific method designated by the NTL at issue. We must reject this argument, then, because Jefferson Block must have intended to cover something when it included the High Island 24 lease block on its MMS-1021.

17

single lease, unitized leases, or contiguous (not cornering) leases of the same owner or operator." The implication of these notices, Underwriters argue, is that non-lease term pipelines (also known as right-of-way pipelines), of which there is no dispute the 16-inch pipeline was one, must be separately listed on MMS Form-1021.

As the district court noted, however, "none of the MMS regulations or publications expressly require that the 16-inch pipeline be listed on MMS-1021." Moreover, we note that the NTLs that Underwriters rely on also include guidance suggesting that a separate designation of the 16-inch pipeline was not necessary. NTL No. 99-N01, for example, provides that "[i]f a lease with a single operator contains more than one facility that can be classified as a COF, we require only the COF with the largest potential worst case oil spill discharge on the lease to be listed in the OSFR application." Moreover, NTL No. 2008-N05 provides that "[p]ipelines covered by OSFR must be recorded only in the area and block where the pipeline begins." The 16-inch pipeline began in the High Island 24 lease block, where Jefferson Block also operated other facilities. Thus, even if NTL No. 2008-N05 requires that Jefferson Block treat the pipeline as a separate facility, it appears that Jefferson Block was only required to list one of the facilities in the lease block on the form. Accordingly, we do not believe that the NTLs that Underwriters rely on conclusively resolve the issue that confronts the court—whether the locations that Jefferson Block identified on the MMS-1021 form included the pipeline.

The final piece of extrinsic evidence that Underwriters request the Court consider is an e-mail from Jefferson Block's regulatory consultant, Roberta McClure. That e-mail reads in pertinent part:

> Attached are the OSFR worksheets that will assist you with determining how much coverage you will need. As we discussed, MMS determines coverage based on a lease-basis (lease map of properties attached). This includes all wells, pipelines and facilities

contained within an individual lease. However, ROW pipelines (i.e. the 16[-inch] pipeline that goes to the shore base) are considered differently—there is a separate worksheet included for same. Also, there is the MMS Form 1021 attached for your reference.

The district court concluded that this e-mail suggested that Jefferson Block was required to list the 16-inch pipeline as a separate line on the MMS-1021 if it wanted insurance coverage for the pipeline, because the pipeline was a right-of-way pipeline. Based on this e-mail, the court determined that "[c]learly, Jefferson Block's own experts in the area of MMS regulatory requirements understood that Jefferson Block would not be able to lump the 16-inch pipeline in with the other facilities that were contained within the leases listed on the MMS-1021."

We are not convinced that the import of this e-mail is as the district court suggests. As Jefferson Block notes, the e-mail appears to communicate that the worst-case spill potential for right-of-way (or non-lease term) pipelines is calculated under a different formula than that applied to lease term pipelines. A worksheet attached to the e-mail, titled "Calculation Worksheet for Worst Case Discharge Scenario," supports this interpretation of the e-mail. That worksheet addresses worst-case discharge calculations for right-of-way pipelines like the 16-inch pipeline. At the very least, we cannot conclude that the e-mail conclusively resolves the ambiguity in the OPA Policy with respect to coverage of the 16-inch pipeline.

In short, we do not believe that any of the extrinsic evidence in the record conclusively resolves whether the 16-inch pipeline was a facility entitled to coverage under the OPA Policy. Thus, interpretation of the policy remains a question of law for the court. See Primavera v. Rose & Kiernan, Inc., 670 N.Y.S.2d 223, 224 (App. Div. 1998). Under such circumstances, "it is appropriate . . . to resort to other rules of construction, including the contra-insurer rule, which states that any ambiguity in an insurance policy

should be resolved in favor of the insured." McCostis, 31 F.3d at 113. We now consider whether we should apply the contra-insurer rule in this case.

## C

The district court below concluded that the contra-insurer rule was not applicable in this case.[7] It refused to apply the rule for two reasons. First, the court reasoned that Jefferson Block is at least partly to blame for the ambiguity because it completed the MMS-1021 form without listing the 16-inch pipeline. Second, the court cited the Roberta McClure e-mail to Jefferson as evidence that "Jefferson Block's own regulatory consultant specifically identified to its client the very omission with respect to the 16-inch pipeline that led to the ambiguity with respect to this particular facility." As we have already noted, we do not believe that the McClure e-mail is conclusive, and we see no reason why it would prevent the application of the contra-insurer rule in this case. Thus, we turn to the first reason that the district court provided—that Jefferson Block is at least partly responsible for the ambiguity with respect to coverage of the pipeline.

On appeal, Underwriters reassert the district court's argument and contend that Jefferson Block should not benefit from an application of the contra-insurer rule because "the disputed policy language was drafted, furnished, or completed by the policyholder." Specifically, Underwriters contend that the rule's *raison d'etre* is to prevent the party responsible for an ambiguity, which will typically be the insurer as the drafter of the policy, from benefitting from the ambiguity it created. In this case, Underwriters note that the ambiguity at issue exists in the scheduling of facilities on the MMS-1021 form,

---

[7] Specifically, the district court refused to apply the "reasonable expectations" doctrine. In New York, the "reasonable expectations" doctrine does not materially differ from the contra-insurer rule, a point the district court implicitly made when it described the doctrine as applying "such that any ambiguity in the policy would be construed against Underwriters and in favor of coverage." See also JEFFREY E. THOMAS, 1-5 NEW APPLEMAN ON INSURANCE LAW LIBRARY EDITION § 5.05 (2010) (identifying New York as a state that "us[es] the terminology of reasonable expectations when applying the contra proferentem doctrine").

No. 10-30190

and that Jefferson Block completed that form. According to Underwriters, "[t]o the extent the form as completed by Jefferson Block or its agents was ambiguous as to whether the pipeline was covered, the traditional construction against the insurer as drafter does not apply."

We are not persuaded by Underwriters' arguments, and we believe that the district court erred when it refused to construe the ambiguity in the OPA Policy in favor of Jefferson Block. To be sure, some New York courts have declined to apply the contra-insurer rule based in part on the insured's involvement in crafting the terms of the disputed policy. See, e.g., Cummins, Inc. v. Atl. Mut. Ins. Co., 867 N.Y.S.2d 81, 83 (App. Div. 2008) (declining to construe term against defendant insurer where "the basic concept and terms originated with plaintiff, . . . plaintiff [was] sophisticated and . . . instrumental in crafting various parts of the agreement, and . . . while not an insurance company, had equal bargaining power and acted like an insurance company by maintaining a self-insured retention"); Metpath Inc. v. Birmingham Fire Ins. Co. of Pa., 449 N.Y.S.2d 986, 989 (App. Div. 1982) (resolving ambiguity in an insurance policy against the insured because the policy was drafted by the insured's insurance broker and the contested provisions were requested by the insured's representatives).

However, such cases are inapposite because Jefferson Block's completing the MMS-1021 form does not amount to its drafting or dictating the terms of the policy. Here, it is undisputed that Jefferson Block filled out the MMS-1021 form; however, it was Underwriters that drafted the OPA Policy, incorporating the form as the "Schedule of Offshore Area(s) and Facilities Thereon." Specifically, the record demonstrates that Jefferson Block sent its completed MMS-1021 form to Underwriters to get a rate quote but that it was Underwriters which drafted the OPA Policy to use the form, which lists locations of facilities rather than facilities themselves, as the schedule of facilities. Thus, the ambiguity with

21

respect to coverage is the direct result of the policy language prepared by Underwriters insofar as that language incorporates the MMS-1021 form into the policy.

Underwriters' responsibility for the ambiguity is not diminished by the possibility that Jefferson Block could have recorded the pipeline on the MMS-1021 form by its right-of-way number, or by listing it in an appendix attached to the form. As the district court acknowledged, while the form may have allowed for a more precise designation, "none of the MMS regulations or publications *expressly* require that the 16-inch pipeline be listed on MMS-1021." Further, Underwriters just as easily could have included in the OPA Policy an actual schedule of facilities, rather than incorporating a regulatory form that deals only in locations. Jefferson Block's choice to fill out the MMS-1021 form as it is provided, by listing only the lease block on which the pipeline begins, does not change the fact that it was Underwriters which, after receiving the completed form from Jefferson Block, made it a provision of the OPA Policy, without alteration or further specification.[8] To the extent Jefferson Block may have had an indirect and modest role in creating the ambiguity by filling out the MMS-1021 form, that causal link is one wholly of Underwriters' own creation. Thus, the cases suggesting an exception to contra-insurer applicable where insureds draft or actively negotiate policy terms are inapplicable to this case.

---

[8] Nevertheless, according to the dissent, Jefferson Block "had ample power to affect the ambiguity at issue here." Even if this is so, the dissent does not explain how in this case the "power to affect the ambiguity" equates to the active negotiation of contract terms that some New York courts have held justifies departure from the contra-insurer rule. As the dissent notes, those courts have focused on whether parties had "no voice in the *selection*" of contract terms. As explained above, when Jefferson Block competed the MMS-1021 form, it simply was not selecting policy language, but was merely completing a regulatory form. It was Underwriters, and Underwriters alone, that selected the policy language incorporating that form. Thus, even if those cases represent current New York law, and we do not conclude that they do, they are inapposite because Jefferson Block "had 'no voice in the selection of [the contractual] language.'" *Sci. Applications Int'l Corp. v. State*, 60 A.D.3d 1257, 1259 (N.Y. App. Div. 2009) (quoting *67 Wall St. Co. v. Franklin Nat'l Bank*, 333 N.E.2d 184, 187 (N.Y. 1975)).

No. 10-30190

In short, we believe that the district court erred when it refused to apply the contra-insurer rule in this case. As we have discussed, the OPA Policy is ambiguous with respect to the issue of coverage for Jefferson Block's 16-inch pipeline. This ambiguity arises because the policy's schedule of insured facilities refers to an MMS-1021 form that lists only the locations of facilities. Whether the pipeline—which begins at one of the locations designated on the form but crosses others not so designated—is a facility "thereon" one of the locations on the form cannot be determined through reference to the plain language of the policy. As we noted above, the extrinsic evidence in the record does not conclusively resolve this ambiguity. Since Jefferson Block offers a reasonable interpretation of the policy—that a right-of-way pipeline originating in one of the lease blocks designated on an MMS-1021 form is included in that designation—and did not completely draft the ambiguous provisions of the OPA Policy, the contra-insurer rule should apply and the ambiguity should be resolved in favor of the insured, Jefferson Block. The 16-inch pipeline was a "covered offshore facility" designated on Jefferson Block's MMS-1021 form and thus included within the scope of coverage afforded by the OPA Policy.

*    *    *

For the aforementioned reasons, the district court's grant of summary judgment is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.

23

No. 10-30190

EMILIO M. GARZA, Circuit Judge, dissenting:

Jefferson Block 24 Oil & Gas, L.L.C. ("Jefferson Block") contends that an Oil Pollution Act ("OPA") insurance policy insures it against the costs of a recent spill from a particular 16-inch right-of-way oil pipeline. The policy's underwriters ("Underwriters") contend that the policy does not. The district court granted summary judgment to the Underwriters, concluding that the policy did not reach spills from the pipeline. The majority reverses, relying on the rule of *contra proferentem* to construe ambiguity in the policy against the Underwriters. The substantial weight of recent New York authority, however, suggests that *contra proferentem* should not apply in this case. I therefore dissent.

The OPA requires a responsible party to "establish and maintain, in accordance with regulations promulgated by the Secretary, evidence of financial responsibility sufficient to meet the maximum amount of liability to which the responsible party could be subjected . . . ." 33 U.S.C. § 2716. The implementing regulations require a responsible party to submit, to the Minerals Management Service ("MMS"), certain forms including, in some cases, a form designated MMS-1021. 30 C.F.R. § 253.40(a)(3). The purpose of the MMS-1021 form is to identify a filer's covered offshore facilities ("COFs"). *Id.* In this case, however, MMS-1021 has been put to another, perhaps problematic purpose: defining the scope of Jefferson Block's coverage under its insurance policy. As the majority explains, relying on the MMS-1021 form to define the scope of the policy lends itself to some ambiguity with regard to whether the pipeline in this case is covered by the policy.

We must resolve that ambiguity under the laws of the State of New York. "[T]o determine state law, federal courts look to final decisions of the highest court of the state." *Transcon. Gas Pipe Line Corp. v. Transp. Ins. Co.*, 953 F.2d 985, 988 (5th Cir. 1992). "In the absence of a final decision by the state's highest

24

court on the issue at hand, it is the duty of the federal court to determine, in its best judgment, how the highest court of the state would resolve the issue if presented with the same case." *Am. Int'l Specialty Lines Ins. Co. v. Canal Indem. Co.*, 352 F.3d 254, 260 (5th Cir. 2003) (citing *Transcon. Gas Pipe Line*, 953 F.2d at 988). "[A]n intermediate state appellate court decision is not controlling *per se*," but may serve as "a guide to assist the federal court in its goal of determining how the state's highest court would decide the issue." *Richards v. La. Citizens Prop. Ins. Corp.*, 623 F.3d 241, 244 (5th Cir. 2010).

The majority concludes that New York law requires us to resolve this case in Jefferson Block's favor pursuant to the traditional rule of *contra proferentem*. *Contra proferentem* provides that "in cases of doubt or ambiguity, a contract must be construed most strongly against the party who prepared it and favorably to a party who had no voice in the selection of its language." *67 Wall St. Co. v. Franklin Nat'l Bank*, 37 N.Y.2d 245, 249, 371 N.Y.S.2d 915, 333 N.E.2d 184 (1975). In the context of insurance disputes, *contra proferentem* has taken the form of the so-called "contra-insurer" rule, which provides that "[w]hen an ambiguity is found [in a policy], it must be construed against the insurer and in favor of coverage." *Nationwide Mut. Ins. Co. v. CNA Ins. Co.*, 286 A.D.2d 485, 487, 729 N.Y.S.2d 760, 762-63 (2d Dep't 2001). Early New York cases cast the rule in uncompromising terms, requiring that "[w]here an insurance contract is so drawn as to be manifestly ambiguous, so that reasonable and intelligent men on reading it would honestly differ as to its meaning, the doubt should be resolved against the company, because it prepared and executed the agreement, and is responsible for the language used and the uncertainty thereby created." *Kratzenstein v. W. Assur. Co. of Toronto*, 116 N.Y. 54, 59 (1889) (citation omitted). New York courts, however, have long since moved away from the "earlier and more rigid" versions, adopting instead a more nuanced approach that recognizes that *contra proferentem* will not always provide the appropriate

rule of decision. *U.S. Fire Ins. Co. v. Gen. Reinsurance Corp.*, 949 F.2d 569, 573 (2d Cir. 1991).

A review of the case law reveals numerous opinions suggesting that *contra proferentem* will not apply where the party seeking the benefit of the doctrine was sophisticated and negotiated the legal instrument at issue. *See, e.g.*, *Sci. Applications Int'l Corp. v. State*, 60 A.D.3d 1257, 1259, 876 N.Y.S.2d 182, 184 (3d Dep't 2009) (declining to construe contract against the drafter because both parties "are sophisticated parties and there is evidence that they engaged in negotiations as they worked out some of the details of the contract"); *Coliseum Towers Assocs. v. Cnty. of Nassau*, 2 A.D.3d 562, 565, 769 N.Y.S.2d 293, 297 (2d Dep't 2003) ("The contra proferentem doctrine was inapplicable to the subject lease since the record demonstrates that [the plaintiff] participated in negotiating its terms."); *Citibank, N.A. v. 666 Fifth Ave. Ltd. P'ship,* 2 A.D.3d 331, 331, 769 N.Y.S.2d 268, 269 (1st Dep't 2003) ("The ambiguities are not, however, to be construed against defendant by reason of its having drafted the initial version of the leases, since the lease agreements ultimately entered into resulted from extensive negotiations in which both parties, each a commercially sophisticated entity, were represented by counsel, and plaintiff failed to show that it 'had no voice in the selection of [the leases'] language.'" (citation omitted))*; Am. Prop. Consultants, Ltd. v. Zamias Servs., Inc.*, 294 A.D.2d 217, 217, 741 N.Y.S.2d 852, 853 (1st Dep't 2002) ("Defendants' request for a *contra proferentem* charge was properly denied since, although plaintiff prepared the first draft of the subject fee agreement, defendants negotiated significant changes to it and had counsel available to review the agreement for them."); *MPEG LA, LLC v. Audiovox Elecs. Corp.,* 2011 N.Y. Slip Op. 21260, 2011 WL 3169208, at *15 (Sup. Ct., Suffolk Cnty., 2011) (remarking that *contra proferentem* probably does not apply to sophisticated parties); *Oceana Holding Corp. v. Atl. Oceana Co., Inc.*, 4 Misc. 1029(A), 2004 N.Y. Slip Op. 51122(U), 2004 WL 2246177, at *5 (Civ.Ct.,

No. 10-30190

Kings Cnty., 2004) (stating that the "'contra proferentem doctrine' . . . is inapplicable when both parties participated in negotiating the terms" ); *accord In re September 11th Liab. Ins. Coverage Cases*, 458 F. Supp. 2d 104, 118 n.11 (S.D.N.Y. 2006) (stating that construing a policy against the insurer "is 'generally inappropriate if both parties are sophisticated.'" (quoting *DaPuzzo v. Globalvest Mgt. Co.*, 263 F. Supp. 2d 714, 719 (S.D.N.Y. 2003))).[1]

The majority, however, disregards these cases and concludes that *contra proferentem* must apply because Jefferson Block did not "draft[ ] or dictat[e]" the terms of the insurance policy.  But neither New York case law nor the purposes of *contra proferentem* justify defining the rule's exceptions so narrowly.  *Contra proferentem* is designed to protect a party that "had 'no voice in the selection of [the contractual] language.'" *Sci. Applications*,  876 N.Y.S.2d at184 (quoting *67 Wall St. Co.*, 37 N.Y.2d at 249).  A party need not be the sole drafter or dictator of a contract's terms in order to have a "voice in the selection" of the contract's language.  Moreover, "the touchstone for applying *contra proferentem* is the insured's lack of sophistication," particularly where the parties do not have "equivalent bargaining power."  *U.S.  Fire  Ins.  Co.*, 949 F.2d at 574.   A sophisticated party with a means to influence the terms of the contract should be able to identify and, if necessary, remedy ambiguities at the time of drafting. Such a party does not need a thumb on the scales in its favor.

---

[1] Our sister circuit once observed that "[i]t is unsettled in New York whether contra proferentem applies if the policyholder is a sophisticated entity that negotiated contract terms."  *Morgan Stanley Grp. Inc. v. New Eng. Ins. Co.*, 225 F.3d 270, 279 (2d Cir. 2000). It is not entirely clear that the Second Circuit still views this question as undecided.  Two years after it declared the law unclear in *Morgan Stanley*, the court seemed to revise that estimate, suggesting that it is "generally inappropriate" to apply contra proferentem to contracts between sophisticated parties.  *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 88 n.7 (2d Cir. 2002) (citing *U.S. Fire Ins. Co.*, 949 F.2d at 573).  In any event, our duty is not to answer this question as the Second Circuit would answer it, but as New York's highest court would.

No. 10-30190

It is clear that Jefferson Block, a commercial enterprise engaged in an expensive, large-scale, and highly technical industry, is a sophisticated party. It was also the party in the best position to know the details of the facilities it operated. There is no reason, then, to think that Jefferson Block lacked the sophistication necessary to see the ambiguity at issue here. We should turn, then, to whether Jefferson Block had a voice in the creation of the ambiguous terms of the policy. It is true that, as the majority stresses, the drafter of the policy chose to rely on the MMS-1021 form. But Jefferson Block filled that form out and, moreover, filled it out incorrectly. The ambiguity here arises entirely out of Jefferson Block's answers to the form, not the decision to incorporate the form itself. As the majority concedes, a procedure exists for including a non-COF facility on an MMS-1021. Jefferson Block simply failed to comply with that procedure. Therefore, regardless of the extent to which Jefferson Block negotiated the terms of the policy as a whole, it certainly had ample power to affect the ambiguity at issue here. In light of the substantial body of law cautioning against reliance of *contra proferentem* in such a situation, I cannot concur with the majority's decision to do so here.

What we are left with, then, is an ambiguous contract that we must construe using the ordinary tools of contractual interpretation. By my reading, the Underwriters' interpretation seems to most closely fit the language at issue and the extrinsic evidence relied upon by the district court. The MMS-1021 is, by its own terms, a list of locations of COFs. The purpose of the MMS-1021 is to *identify* COFs. The most natural reading of the policy is that it is intended to reach COFs and/or any non-COF facilities that are properly identified on the form in the manner directed for non-COF facilities. I therefore respectfully DISSENT.